726 F.2d 972
 115 L.R.R.M. (BNA) 2584, 100 Lab.Cas. P 10,755,
1 Fed.R.Serv.3d 432, 5 Employee Benefits Ca 1042
 Napolean S. AMBROMOVAGE, Lewis Kurtz, Frank Tragus, John
Brinkash, Alex Gonzales, Emmett Thomas, Nicholas J. Haydock,
John D. Jillson, Joseph Fauzio, and Frank J. Galgay,
Trustees of the Anthracite Health and Welfare Fund,
Plaintiffs-Appellants
v.
UNITED MINE WORKERS OF AMERICA, An Unincorporated Trade
Union Association, Defendant-Appellee.
Appeal of Napolean S. AMBROMOVAGE, et al.
Napolean S. AMBROMOVAGE, Lewis Kurtz, Frank Tragus, John
Brinkash, Alex Gonzales, Emmett Thomas, Nicholas J. Haydock,
John D. Jillson, Joseph Fauzio, and Frank J. Galgay,
Trustees of the Anthracite Health and Welfare Fund,
Plaintiffs-Appellees
v.
UNITED MINE WORKERS OF AMERICA, An Unincorporated Trade
Union Association, Defendant-Appellant.
Appeal of UNITED MINE WORKERS OF AMERICA, An Unincorporated
Trade Union Association.
 Nos. 82-3496, 82-3515.
 United States Court of Appeals,
Third Circuit.
 Argued June 1, 1983.
Decided Jan. 25, 1984.
 
 Thomas M. Kittredge (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., James S. Palermo, Hazelton, Pa., for plaintiffs-appellants in No. 82-3496 and plaintiffs-appellees in No. 82-3515.
 Daniel B. Edelman (argued), Joseph A. Yablonski, Yablonski, Both & Edelman, Washington, D.C., Thomas N. O'Neill, Jr., Carol A. Mager, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for defendant-appellee in No. 82-3496 and defendant-appellant in No. 82-3515.
 Before GIBBONS and BECKER, Circuit Judges and WEBER,* District Judge.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 These appeals concern the liability of cross-appellant United Mine Workers of America (the "Union") for failure to collect royalties owed by a number of coal operators to the Anthracite Health and Welfare Fund (the "Fund"), and the availability for set-off against such liability of certain loans made by the Union to the Fund. Appellants, retired mine workers or their dependents, are the beneficiaries of the Fund.
 
 
 2
 This is the fourth time that this Court has addressed some aspect of this litigation, which is now in its twenty-first year.[1] In Nedd v. United Mineworkers of America, 556 F.2d 190 (3d Cir.1977) ("Nedd II" ), we held that the Union could be held liable for the delinquent royalties. Our holding was based on the Union's role in controlling the Fund from 1947 to 1967, principally its illegal control of the board of directors of the Fund. We held that this control imposed a fiduciary duty on the Union with regard to its efforts to collect the royalties owed to the Fund, beyond any that might have existed by virtue of its status as collective bargaining representative. We remanded for further proceedings. These appeals stem from those proceedings, in which the district court sought to follow the mandate of Nedd II. The court took certain additional evidence and then applied the holding of Nedd II to the record. The court found the Union liable for some seven and one-half million dollars for failure to collect royalties, but, finding that loans to the Fund by the Union totalling more than thirteen million dollars were available to offset the Union's liability, entered judgment for the Union.
 
 
 3
 This appeal presents three principal questions, one dealing with the liability of the Union and two with the set-off, which we will dispose of as follows. First, we will affirm the district court's exercise of discretion in denying pre-judgment interest on the amounts for which it held the Union liable. This is the appellants' only challenge to the district court's calculation of the Union's liability. Our holding on this point fixes the maximum liability of the Union at $7,589,296.63.[2] Second, we will affirm the district court's determination that the Union met its burden (imposed by Nedd II ) of showing that its forgivenesses of certain loans made in the 1950's and 1960's (the "1950's loans" and the "1960's loans") were not intended as gifts, and were thus available for set-off against the Union's liability.
 
 
 4
 Third, we will affirm the district court's holding that it had jurisdiction over the Union's claim for set-off based on loans made by the Union to the Fund in the 1970's (the "1970's loans"), although on different grounds. Notwithstanding that this set-off is a permissive counterclaim for which there is no independent basis of federal jurisdiction, we hold that the question of the existence of ancillary jurisdiction does not turn on the characterization of the counterclaim as "permissive" or "compulsory," but rather on the presence or absence of a "common nucleus of operative fact," the jurisdictional test propounded in United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Finding such a common nucleus between the appellants' claim and the 1970's loans, we conclude that there is federal jurisdiction. We also agree with the district court that all of the 1970's loans have matured,[3] hence the amount of the Fund's liability to the Union based on these loans is also available for set-off.
 
 
 5
 Because the amounts available for set-off from the 1950's, 1960's, and 1970's loans is $12,634,000.00, while the maximum liability of the Union, once appellants' claim for pre-judgment interest has been rejected, is only $7,589,296.63, we will affirm the judgment of the district court in favor of the Union. The other contentions of the parties would either decrease the Union's liability or increase the amount available for set-off; because the Union does not seek an affirmative recovery, we do not reach those other contentions.
 
 I. FACTUAL AND PROCEDURAL HISTORY
 
 6
 The events that led to this litigation began with the signing of the Anthracite Wage Agreement of 1946 between the Union and the Anthracite Coal Mine Operators. That agreement created the Fund as an independent trust fund for the collection of contributions from the operators based on their production, and for the distribution of pensions to former Union members and their dependents. The 1946 Wage Agreement provided that the Fund would be managed by three trustees, one appointed by the operators and two appointed by the Union. In 1947, Congress enacted the Labor-Management Relations Act (the "Taft Hartley Act"), which requires that unions and management be equally represented on the board of trustees of pension trust funds. See 29 U.S.C. Sec. 186(c)(5) (1982). The Union and the mine operators thereupon agreed to designate one of the Union trustees as "neutral," in order to bring the Fund within the requirements of the Taft-Hartley Act.
 
 
 7
 In addition to de facto control of the Fund's board of trustees, the Union was actively involved in efforts to insure the collection of payments from the operators. These efforts "paralleled, and in some instances replaced, trustee enforcement efforts." Ambromovage v. Thomas, Civ. No. 8696, slip op. at 9 (M.D.Pa. July 9, 1982) [hereinafter "1982 Mem.Op."].[4] In addition, beginning in 1951, the Union made numerous loans to the Fund, eventually totalling $13,247,344.00. These loans were made in order to enable the Fund to continue paying pensions to the retired miners. As will be explained in detail below, many of the loans have since been forgiven.[5] In short, for the first two decades of its existence, the Fund operated substantially as an adjunct to the Union.
 
 
 8
 The history of the Fund has been characterized by severe financial distress. Beginning in the 1950's, anthracite coal production suffered a precipitous and prolonged decline. Many operators fell behind on the payment of royalties to the Fund. This created a situation in which the Union's loyalties were divided: although the interests of pensioned miners required diligent collection of Fund royalties, the Union was inclined to be less than vigorous in pressing financially distressed operators to pay delinquent royalties, lest their efforts drive the operators out of business and destroy the jobs of active members. The Union's attempts to balance the interests of its two constituencies resulted in a growing number of delinquencies, and a corresponding decline in benefit payments. This litigation grew out of a movement to protest benefit reductions which began in 1961.[6]
 
 
 9
 The complaint in this case[7] alleged four theories of liability. The first was based on the Union's duty to enforce a collective bargaining agreement, which was inferred from the jurisdictional grant in section 301(a) of the Taft-Hartley Act, 29 U.S.C. Sec. 185(a).[8] The second theory was based on the federal common law duty of fair representation. The third theory was based on a fiduciary duty implied from section 302(c) of the Taft-Hartley, 29 U.S.C. Sec. 186(c), which requires that pension payments be made through a pension plan jointly administered by management and the union.[9] Finally, the complaint included a claim based on the Pennsylvania law of trusts, over which the district court had pendent jurisdiction.
 
 
 10
 The case was tried to the district court without a jury on July 15-16, 1974. In its opinion, filed on April 13, 1976, Nedd v. United Mineworkers of America, Civ. No. 8796 (M.D.Pa. April 13, 1976) [hereinafter "1976 Mem.Op."], the court held that it had no subject matter jurisdiction over the appellants' claims.[10] In spite of this holding, the district court proceeded to make a determination on the merits, finding no breach of duty by the Union under any of the appellants' theories. Although the court found the trustee's failure to act during the 1950's to be negligent, it held that neither the trustees nor the Union acted in bad faith toward the pensioned miners, and that the Union was not vicariously responsible for the trustees' negligence because the trustees were not acting as agents of the Union in their role as trustees. The court also held that, even if the Union were liable, the damages should be reduced by the amount of the loans made by the Union to the Fund.
 
 
 11
 In Nedd II, we reversed the district court's jurisdictional holding, and remanded the case on the merits. We found that there was jurisdiction over the federal claims against the Union based on all three theories alleged by the appellants, see supra, and found that pendent jurisdiction supported the state claim as well. Turning to the merits, we found that, as a result of the Union's predominant position in the Fund's operations, the Union had "placed itself in the position of the Trustees for all practical purposes with respect to the enforcement of the royalty obligations of the mine operators."[11] We then held that the district court erred in requiring the appellants to establish the Union's intent to benefit the currently employed miners at the expense of the pensioned miners. Rather, we concluded that once the appellants had established that the Union controlled the trustees, and that the Union's and the trustees' limited enforcement efforts had prima facie benefitted the active miners' interests over those of the pensioned miners, the district court should have placed the burden on the defendants to justify their stewardship of the Fund.[12] Accordingly, we remanded the case for reconsideration of this issue. We also remanded on the issue of whether the Union could set off its loans to the Fund against the damages, holding that the Union had the burden to demonstrate that it was entitled to set-off.
 
 
 12
 On remand, the district court filed several opinions resolving the questions left open by Nedd II. First, the court rejected appellants' claim for prejudgment interest.[13] In a second opinion[14] the court found (1) that the appellants' evidence adequately established the amount of the Union's potential liability;[15] and (2) that the Union was liable for royalty delinquencies of certain operators who had not signed the relevant collective bargaining agreements because of the Union's failure to meet its obligation to take steps to make the agreements legally binding on those operators.[16] The aggregate scope of potential liability was set at $9,789,395.55.
 
 
 13
 In a final opinion,[17] the district court dealt with two issues. The first was whether the Union had met its burden of proving that its actions were not the "cause" of the Fund's losses attributable to the delinquencies of certain operators. The second was whether the Union had met its burden of proving that it was entitled to set off the loans it had made to the Fund. On the "causation" issue, the court first established general principles concerning the Union's burden of proof. The court held that evidence that an operator's delinquencies were ultimately uncollectible would not, alone, amount to proof that the Union's conduct had not caused the harm to the Fund. Instead, the court required that the Union also prove that its policy of lenience in allowing the delinquencies to accumulate was reasonable with regard to each operator. The court also held that the Union had a duty to pursue "reasonable" efforts to collect the delinquencies, and that the use of the Union's economic power might, depending on the facts of that case, be within this duty. Finally, the court rejected the appellants' argument that the Union could not, under any circumstances, meet its burden of proof. Appellants' argument was that because the Union failed to act "promptly, vigorously, and continuously" in pursuing delinquencies, it was impossible to establish whether the delinquencies would have at all times been uncollectible due to the financial problems of the operators, and that therefore the Union's proof on the causation issue was "unduly speculative."
 
 
 14
 The court then applied these principles to the Union's challenges to its liability for the delinquencies of nine particular operators.[18] The Union was exculpated in full for the delinquencies of two of those operators, and in part for the delinquencies of three others. None of these decisions has been appealed by either party. The Union was held liable for the full amount of the delinquencies of the other four operators. The Union has appealed two of these holdings.[19] The total amount of the Union's liability was set at $7,589,296.63.[20]
 
 
 15
 The district court then held that the Union had met its burden of proving that the Union's forgivenesses of the 1950's and 1960's loans did not constitute gifts, and that the amount of those loans was therefore available for set-off. The court also held that it had jurisdiction to set off the 1970's loans, although these loans were not connected to the "liability-creating conduct" of the Union. As a result, the court found over $13 million available for set-off against the liability of approximately $7.6 million, and granted judgment for the Union.
 
 
 16
 On appeal, appellants raise three challenges to the set-off. First, they argue that there is no federal jurisdiction over the Union's claims based on the 1970's loans. Second, appellants argue that the Union has failed to meet its burden of demonstrating that the forgiveness of the 1950's and 1960's loans was not intended to be a gift. Appellants also challenge, on the same basis, the district court's holding that the Union could set off certain amounts loaned to the Fund by Districts 1, 7, and 9 in the 1950's.[21] Third, appellants argue that the most recent loans, made in 1975 and 1977, have not matured, and are therefore unavailable for set-off. In addition to the set-off issues, appellants challenge the district court's decision not to grant pre-judgment interest.
 
 
 17
 The Union, on cross-appeal, challenges the district court's holdings that the Union is liable for the delinquencies of the non-signatory operators, and that it had failed to establish non-liability with respect to the delinquencies of two particular signatory operators, Diamond Coal Company and No. 9 Coal Company. We need not reach these questions.
 
 
 18
 We turn first to the questions of the Union's liability for prejudgment interest, and then consider the availability of the 1950's, 1960's, and 1970's loans for set-off.
 
 
 19
 II. LIABILITY OF THE UNION FOR PREJUDGMENT INTEREST
 
 
 20
 In denying prejudgment interest, the district court concluded that, under either federal or Pennsylvania law, an award of interest in this case was a matter of discretion.[22] The court observed that "[t]he law of trusts, which relegates the cestuis que trust to equitable rather than legal remedies, see, e.g., [Nedd II], 556 F.2d at 207, follows the tendency to allow the court sitting in equity discretion to grant or deny prejudgment interest." 488 F.Supp. at 1214. Appellants argue, however, that there are two distinct legal theories under which they are entitled to recover interest: what they term "interest damages," and prejudgment interest. Under the interest damage theory, they argue that interest on the uncollected royalties was due as an element of damages, and that it was not within the district court's discretion to withhold interest once it was established that the Union was liable for an ascertained amount in royalties that remained uncollected for a specific period of time before the judgment.[23] Under the second theory, appellants argue that, assuming the district court had discretion to withhold an interest award, the court abused its discretion. In appellants' submission "interest damages" arise "from the breach [of duty] itself," while prejudgment interest arises "from defendant's delay in accounting to the plaintiff for it."[24]
 
 
 21
 We perceive only one legal right, under either Pennsylvania or federal law.[25] As the district court noted, "[p]rejudgment interest is 'compensation allowed by law ... as additional damages for loss of use of the money due as damages, during the lapse of time since the accrual of the claim.' C. McCormick, Handbook of the Law of Damages Sec. 50 (1935)." 488 F.Supp. at 1213. Interest represents the time value of money, and the allowance of its recovery from the time a plaintiff's claim accrues is designed to return the plaintiff to the position he would have been in had the principal amount of damages been paid at that time. It compensates the plaintiff for the delays inherent in litigation. Under the law applicable to this case, the right to interest does not arise "from the breach itself."
 
 
 22
 Under Pennsylvania law, interest on damages for breach of fiduciary duty has been allowed "not as interest eo nomine but by way of damages." In re Kenin's Trust Estate, 343 Pa. 549, 566, 23 A.2d 837 (1942); see In re Jones' Estate, 400 Pa. 545, 162 A.2d 408 (1960). In Sack v. Feinman, 489 Pa. 152, 413 A.2d 1059 (1980), a constructive trust was imposed on defendant in the amount of $25,000 for fraudulent conversion of bonds. The bonds had been held by plaintiff's and defendant's mother in trust for plaintiff. Defendant, using powers of attorney executed by his mother in her favor, redeemed the bonds, placed the proceeds in a joint account held with the mother, and then transferred the funds to her sole account. The transfer took place in 1970, but the constructive trust was not imposed until 1975. The chancellor did not grant prejudgment interest, thinking he was precluded by statute from making such an award. The Pennsylvania Supreme Court held that prejudgment interest was not precluded, but remanded to the chancellor, stating:
 
 
 23
 Th[e] weight of authority compels the conclusion that the Act of April 6, 1859 does not bar an award of pre-verdict interest in order to prevent unjust enrichment or where the payment of interest is required to avoid injustice. These authorities are also in agreement that the decision, whether to award interest and the amount of such interest, is vested in the discretion of the chancellor.
 
 
 24
 489 Pa. at 165, 413 A.2d at 1065-66. See also Murray Hill Estates, Inc. v. Bastin, 442 Pa. 405, 276 A.2d 542 (1971). In Sack, the plaintiff could legitimately argue that she was not made whole by an award of the principal without further award for the loss of its use for five years. The Pennsylvania Supreme Court nonetheless remanded for a discretionary consideration whether to award interest.[26] We think it is clear, under Sack, that "prejudgment interest" awards in Pennsylvania are discretionary with the trial court.
 
 
 25
 In connection with the federal claims, damages questions are governed by federal law, but federal law does not appear to differ from Pennsylvania in this regard. In the absence of an explicit congressional directive,[27] the awarding of prejudgment interest under federal law is committed to the trial court's discretion, and "given in response to considerations of fairness[,] ... denied when its exaction would be inequitable." Board of Commissioners of Jackson County, Kansas v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939) (action by the United States).[28] We find then that the district court has discretion in a case such as this to either grant or deny prejudgment interest under both Pennsylvania and federal law.
 
 
 26
 We next turn to an examination of the court's exercise of that discretion. Appellants argue that the discretion available to award or deny prejudgment interest is limited. Relying on the general rule in admiralty cases, see, e.g., In re Bankers Trust Co., 658 F.2d 103, 108 (3d Cir.1981), cert. denied, 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982),[29] our decision in Eazor Express, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 520 F.2d 951, 973-74 (3d Cir.1975), and a Fifth Circuit case, West v. Harris, 573 F.2d 873 (5th Cir.1978), appellants argue that prejudgment interest must be awarded unless specified exceptional circumstances are present. This is the rule in admiralty, and it has long been established. See, e.g., The Wright, 109 F.2d 699 (2d Cir.1940). It is not the general rule for awarding interest, however, and we decline to extend it to limit the district court's discretion here. The general federal rule was announced in Board of Commissioners, 308 U.S. at 352, 60 S.Ct. at 289. See Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); Thomas v. Duralite, 524 F.2d 577, 589 (3d Cir.1975). None of the cases cited by appellants undercuts that rule, i.e., in the absence of a Congressional directive to the contrary, the district court has broad discretion in determining whether to allow pre-judgment interest.[30]
 
 
 27
 The district court denied prejudgment interest primarily because the Union had loaned over thirteen million dollars[31] to the Fund, without interest, in the 1950's, 1960's, and 1970's.[32] The Court considered the Union's replacement of delinquent royalties with these interest free loans to be an equitable factor militating against awarding interest, regardless of whether the principal amount was to be made available as an offset to the principal of the delinquencies.[33] The Fund received the loan proceeds at the same time as appellants contend that it was damaged by the failure to pursue delinquencies. The delinquencies were a result of the decline in anthracite production, which also motivated the loans. If the delinquencies had been successfully pursued but the loans not made, the Fund and the pensioned miners would have been in about the same situation as they were with both the delinquencies and the loans. The fact that the loans were interest-free does not change this analysis. It is yet another indication of the fact that the Union's purpose in making the loans was to prevent harm to the Fund while awaiting the elusive upturn in the anthracite industry. Without entering into a detailed analysis of the extent to which the loans reduced the impact of inflation on the loss to the Fund due to the delinquencies, the district court concluded that the contemporaneous advancement by the Union of interest-free loans basically offset that impact.
 
 
 28
 Appellants advance two points in attacking the district court's exercise of discretion. First, they argue that the Union acted willfully in concealing delinquencies and in violating the requirements of section 302(c)(5) of the Taft-Hartley Act by maintaining a Union officer as the "neutral" trustee. The Union, appellants argue, cannot avail itself of equity because it comes before the court with unclean hands. But this argument, as the Union points out, runs counter to the district court's findings that the Union acted in good faith, and did not conceal the delinquencies to avoid suit. We cannot say those findings are clearly erroneous.[34] The decision denying prejudgment interest is therefore not vitiated by this equitable defense.
 
 
 29
 Second, appellants argue that the court abused its discretion by failing to calculate the actual benefit to the Fund from the interest-free loans and measure it against the actual losses to the Fund due to the delinquencies. We think the better course would have been to perform such a calculation, but we cannot say, given the actual difference between the amounts loaned and the Union's liability, that this was an abuse of discretion.[35] We conclude that it was not improper for the court to consider, as it did, that the Union had loaned the Fund an additional $1.5 million by the time of trial and $5.9 million by the time the court entered judgment. The additional interest free loans conferred an additional benefit on the Fund, further reducing the need for an award of prejudgment interest to make the Fund whole.
 
 
 30
 In sum, we reject appellants' contention that they were entitled, as a matter of law, to prejudgment interest. Our scope of review is, therefore, limited to determining whether the district court abused its discretion. For the reasons noted above, we conclude that it did not. Accordingly, we affirm the district court on this point.
 
 III. THE AVAILABILITY OF SET-OFF TO THE UNION
 A. The 1950's and 1960's Loans
 
 31
 In Nedd II, we remanded to the district court the question whether the Union could set off the amounts of the Union's loans to the Fund over the last thirty years against its liability to the Fund. We noted that if the Union's forgiveness of the 1950's and 1960's loans constituted gifts, the loans could not be set off, explaining that under settled principles of trust law, a settlor-trustee cannot set off the amount of his gifts to the trust against his liability for a subsequent breach of trust. Since little evidence had been offered concerning the Union's intent in cancelling the indebtedness, we found "[t]he district court's conclusion that no gift was intended highly speculative." 556 F.2d at 214. Concluding that the court must have placed the burden of proving the Union's intent on the appellants, we remanded to allow the court to reconsider the question, with the burden of proof properly allocated to the Union.
 
 
 32
 On remand the district court took additional evidence on the question whether the Union intended a gift either when it made the loans or when it forgave them.[36] The court concluded on the basis of that evidence that it did not. The court found that the loans extended in 1951-53, totaling $3,795,000[37] were made to cover benefit payments, and that the Union anticipated an imminent recovery in the coal industry that would have allowed the Fund to repay the loans. Thus the court found that these loans were not intended as gifts at the time they were made. Based on the deposition testimony of John Owens, Secretary and Treasurer of the Union from 1948 to 1972, the court found that in 1959 the Union determined that the loans were uncollectible and that this determination motivated the Union to cancel the loans. The court also pointed to the Union's 1959 tax return, on which the cancellations were listed as write-offs but not as gifts. The court concluded that an attempt to collect the loans would have wiped out the Fund, and that the Union and the trustees, in arranging the loans, had assumed that an upturn in the anthracite industry would subsequently allow the loans to be repaid without reducing benefits. When this assumption proved false, the Union forgave the loans.
 
 
 33
 The court found that loans of $2,885,000, made in 1960 and 1961, were based on trustee representations that the industry was "picking up," that there was a possibility of increased exports of coal to France, and that the trustees had been experiencing improved success in collecting arrearages in royalty payments from operators. The court found that the Union, on the basis of these representations, expected that repayment would ultimately be made and did not intend the loans as a gift. The Union's decision to forgive these loans in 1970, the court found, was prompted by a demand from the Department of Labor that the Union either collect the loans or stop carrying them on its books as assets. The court also noted that the Union did not treat these forgivenesses as gifts on its tax return. The continued decline of the coal industry during the 1960's led the Union to conclude that repayment of those debts was not a realistic possibility. Thus the court concluded that the cancellation of these debts in 1970 was not intended as a gift.
 
 
 34
 Appellants press two alternative arguments against the district court's holding on this point. Appellants' first argument is that the only intent relevant to the issue of whether a gift was made was whether "the Union intended voluntarily to transfer property to the Fund without consideration therefor." Appellants' second argument is that the district court's determination that the Union had met its burden of proving that the forgiveness of the 1960's and 1970's loans were not intended as gifts is clearly erroneous. We reject both arguments, and affirm the district court's allowance of set-off.
 
 
 35
 The Union indisputably transferred the property by cancelling the debts, indisputably received no consideration for this transfer, and indisputably intended to make the transfer without consideration. Appellants argue that these facts establish "donative intent," as a matter of law, and that any further evidence of the Union's motive or purpose in effecting this gratuitous transfer of property is irrelevant. We disagree.[38]
 
 
 36
 Appellants argue that, because the transferor's actual motive is not discussed in most "gift" cases, it is not relevant. But in most reported opinions dealing with the question whether a gift was made (and, we suspect, in most litigated "gift" cases), the transferor's motivation for making the transfer is not at issue. The issue in such cases is whether the property was retained, in whole or in part, by the transferor. There are situations, however, in which the characterization of a transfer as a "gift" or otherwise depends upon an inquiry into the transferor's purpose, in order to establish the presence or absence of donative intent. This is such a situation. Accordingly, we must look to the Union's purpose in forgiving the loans.
 
 
 37
 A first point of inquiry in making this determination is the nature of the relationship between the Fund and the Union. A transfer of property will be characterized in part on the basis of the relationship between the transferor and transferee. A grant from a government agency, for instance, is generally not considered a gift, because it arises from the general responsibility of a society for its citizens. We recognized this in Feeley v. United States, 337 F.2d 924 (3d Cir.1964).[39] An identical grant from a close relative or close friend is prima facie characterizable as a gift, because it does not derive from a similar legal responsibility, but in all likelihood is due to personal affection.[40] The presumption for or against characterizing a transfer as a gift based on the relationship between the transferor or transferee is derived from experience: when a relative transfers property a gift is generally intended; when a businessman transfers property to another businessman he usually intends compensation.[41] In this case, there is no similar body of experience upon which to base a presumption, and we are unable to analogize the relationship between the Union and the Fund to any of the relationships that have been held to give rise to a presumption either way.[42] Accordingly, we hold that the Union's relationship with the Fund creates no presumption either way as to the Union's intent in making or forgiving the loans.
 
 
 38
 The district court found that no gift was intended because the Union forgave the loans believing them to be uncollectible.[43] Appellants challenge this finding, asserting that the Union was required to prove that the money owed was literally uncollectible. Appellants rely on the fact that in 1959, the year the Union cancelled the 1950's loans, the Fund's debt to the Union was approximately $3.8 million, less than forty percent of the $10.3 million the Fund collected in royalties. The loans therefore could have been paid if the benefits had been reduced by forty percent (from $50 a month to $30 a month) for that year, or if the Fund reduced pensions by a smaller amount for a number of years until the Union was repaid. Although appellants have no record of Fund revenues for 1970, the year the second set of loans was forgiven, they note that the Fund collected $5.6 million from the operators in 1968, almost double the then-outstanding debt of $2.9 million. Based on these facts, appellants argue that the loans were in fact collectible, that the Union has failed to demonstrate that the cancellations were motivated by "uncollectibility," and therefore has not met its burden of proving that the cancellations did not constitute gifts.
 
 
 39
 Appellants misconstrue what is required of the Union. The question before the district court was not whether in fact sufficient assets existed in the Fund to satisfy the debts, but whether the Union intended a gift in forgiving the loans. We will assume that the Union's officers were aware of the facts noted by appellants, none of which are contested by the Union. The Union introduced the testimony of its general counsel, Harrison Combs, which characterizes the Union's reason for cancelling the 1950's loans as follows:
 
 
 40
 [T]he income of the [Fund] had not increased to the point that [the Fund] could pay [the loans] if [it] continued the level of benefits of paying the pensions. That there just wasn't enough money coming in to do that and that it had gone along for some time since the--'54 I suppose it was.
 
 
 41
 It is clear that when Union officers asserted that the loans were "uncollectible," they did not mean that the Fund lacked sufficient revenues to satisfy the debt. We do not think that this fact undermines the Union's position. In the context of the Union's relationship to the Fund, which imposed upon the Union the fiduciary duty of a trustee, it is understandable and entirely proper that the Union's view of what constituted uncollectibility was tied to the responsibilities it had assumed. An attempt by the Union to collect the loans would have defeated its contemporaneous attempts to preserve and if possible increase the level of pension benefits in the face of decreasing revenues.
 
 
 42
 The district court recognized that, in making the loans to the Fund, the Union fully expected to be repaid, but not at the expense of the pensioners:
 
 
 43
 The mutual assumption of the Union and Trustees, that operator contributions would continue at a level permitting both payment of pensions and repayment of the sum advanced, did not prove accurate. Rather than cause termination of the Fund, the Union forgave the loans.
 
 
 44
 1982 Mem.Op. at 76 (emphasis added). It is certainly not unusual for a trustee to make a loan to a trust fund, but subordinate its claim for repayment to other obligations of the fund. The Union showed, to the satisfaction of the district court, that this was its intent. The cancellations reflected a recognition by the Union that its assumption that royalties would increase to a point where the loans could be repaid without a reduction in benefits had proven incorrect.[44] In sum, we hold that the district court's conclusion that the Union did not intend a gift in either making or forgiving the 1950's and 1960's loans is not clearly erroneous, and should therefore be affirmed.
 
 B. The 1970's Loans
 
 45
 Appellants challenge, on two grounds, the district court's allowance of a set off of $5.9 million for loans advanced since 1970. First, appellants claim that the district court lacked subject matter jurisdiction over the set-off defense because there is no federal jurisdiction over permissive counterclaims[45] which lack an independent jurisdictional basis. Second, appellants argue that $4 million of the loans made in 1975 and 1977, represented by a demand note, have not matured because there has been no formal demand for payment, and thus they are not available for set-off.[46] For the reasons developed below, we reject both of these arguments. We address these matters in turn.
 
 
 46
 It is settled that compulsory counterclaims which are otherwise purely state-law claims are nonetheless ancillary to an underlying federal claim, and may be brought in federal court without an independent jurisdictional basis. Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); National Research Bureau, Inc. v. Bartholomew, 482 F.2d 386 (3d Cir.1973); see also Amoco Oil Co. v. Torcomian, 722 F.2d 1099 at 1100 n. 2 (3d Cir.1983). However, appellants argue that it is established in this circuit by Alden's Inc. v. Packel, 524 F.2d 38, 52 (3d Cir.1975), that a permissive counterclaim may only be maintained if supported by an independent jurisdictional ground. The Union rejoins that its claim for set-off based on the 1970's loans falls within an exception to the general rule. Under this exception, which was apparently invented by Professor Moore,[47] a defensive set-off for a liquidated or otherwise ascertained amount, pled solely to diminish or reduce a judgment for the plaintiff, need not be supported by an independent jurisdictional ground.
 
 
 47
 We conclude that there is federal jurisdiction over the Union's set-off claim based on the 1970's loans. Our conclusion, however, is not based on the adoption of the defensive set-off exception; instead, it is based on the application of the general legal principles governing ancillary and pendent jurisdiction to the facts of this case. Some preliminary observations concerning the doctrines of pendent and ancillary jurisdiction are therefore in order.
 
 
 48
 The cases exploring the limits of both ancillary and pendent jurisdiction reflect an effort to deal with the tension between the limits placed on federal jurisdiction by Article III of the Constitution and by federal jurisdictional statutes, and the judicial reality that multiple claims are most efficiently disposed of in a single proceeding, at least where a "common nucleus of operative fact" underlies those claims.[48] Where there is a series of claims based on the same facts, including at least one state and one federal claim, ancillary or pendent jurisdiction is necessary to avoid presenting the parties with the "Hobson's choice" of litigating the same facts twice or losing their right to a federal forum to decide the federal claims. Ancillary and pendent jurisdiction are necessarily limited, on the other hand, by the principles of federalism which underlie constitutional and statutory limits on federal jurisdiction. We believe that the reconciliation of these conflicting policies should be embodied in a "three-tiered" analysis that determines whether ancillary or pendent jurisdiction should be exercised in a particular case.[49]
 
 
 49
 On the first level, a court must determine whether it has constitutional power to determine a state-law claim. This "power" test depends on whether there is a "common nucleus of operative fact" between the state claim at issue and the accompanying federal claims. See United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). As we see it, Gibbs provides the unifying principle which limits the extent of federal jurisdiction over both pendent and ancillary claims.[50] The second level requires the court to determine whether the exercise of jurisdiction at issue would violate a particular federal policy decision, such as the requirement of complete diversity[51] or the explicit exclusion of a particular party from federal liability for the actions alleged in the complaint.[52] At this level, the court may consider whether the plaintiff's assertion of ancillary or pendent jurisdiction is an attempt to manufacture federal jurisdiction where it is otherwise foreclosed by the relevant statutes. The issue generally turns on statutory interpretation. The final level--prudential in character--is for the district court, in its discretion, to weigh various factors bearing on the appropriateness of hearing a pendent claim.[53]
 
 
 50
 In this case, the critical issue is whether the "first tier" hurdle has been met. As stated above, the constitutional test is whether a pendent or ancillary claim has a "common nucleus of operative fact" with the underlying federal claim. Compulsory counterclaims have been held by the Supreme Court to fall within the scope of ancillary jurisdiction. Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). Since Fed.R.Civ.P. 13(a) cannot enlarge the Article III grant of jurisdiction, it is clear that the adjudication of all compulsory counterclaims arising under state law must be justified under the theory of federal jurisdiction recognized in Gibbs. Any counterclaim based on the same "transaction or occurrence" as the underlying federal claim necessarily has a "common nucleus of operative fact" with that claim. It does not follow, however, that Fed.R.Civ.P. 13(a) defines the outer limits of ancillary or pendent jurisdiction.[54] Several transactions may share an intersection of "operative facts," and commentators have recognized that the two tests--"same transaction or occurrence" and "common nucleus of operative fact"--need not map the same landscape.[55] We conclude that the determination that a counterclaim is permissive within the meaning of Rule 13 is not dispositive of the constitutional question whether there is federal jurisdiction over that counterclaim. Indeed, we implied as much in Aldens Inc. v. Packel, 524 F.2d at 52-53, for in that case, after holding that there was no ancillary jurisdiction over permissive counterclaims, we turned to a consideration of whether there might be pendent jurisdiction over the same state law counterclaim.[56]
 
 
 51
 It is not of constitutional significance that state law claim is interposed by a defendant rather than a plaintiff, as in Gibbs. Just as a plaintiff should not, as the price of resorting to an available (though optional) federal forum, be required to try in two forums claims which he would ordinarily expect to try in one, so too, such a plaintiff cannot, by the resort to a federal forum, force the defendant to try in two forums claims he would ordinarily expect to try in one. See J. Moore, Moore's Federal Practice p 13.19, at 13-131-32 (2d ed. 1983).
 
 
 52
 Turning to the second tier of analysis, we must determine whether the exercise of jurisdiction would violate a federal policy decision limiting federal jurisdiction. This is the use of ancillary and pendent jurisdiction that concerned the Supreme Court in Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), and Owen Equipment and Erection Co. v. Kroger, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).[57] Both Aldinger and Owen concentrate on what the court saw as an attempt to circumvent a statutory policy limiting federal jurisdiction. In Aldinger, the plaintiff in a civil rights suit brought a pendent claim against a county government. The county was excluded from liability under 42 U.S.C. Sec. 1983. The court held that the exclusion of the county under section 1983 also meant that the relevant jurisdictional provision, 28 U.S.C. Sec. 1343, did not permit pendent jurisdiction over the otherwise excluded defendant. Similarly, in Owen, the plaintiff sued a diverse defendant, who then impleaded a third-party defendant which was not diverse to the plaintiff. The complaint was then amended by the plaintiff to state a claim against the third party defendant, and the suit against the original defendant was dismissed. The court held that ancillary jurisdiction could not be used to support the plaintiff's claim against the non-diverse third party defendant, because such a use of ancillary jurisdiction would undermine the complete diversity requirement of 28 U.S.C. Sec. 1332. For the reasons described infra, these concerns are not applicable here.
 
 
 53
 Finally, we must examine the scope of the district court's discretion in exercising jurisdiction over this claim. This "tier" requires that the court account for several factors, including fairness to the litigants, judicial economy, and the interests of federalism. In some areas, such as the use of tenuous securities law claims to "bootleg" a business fraud case into federal court, hard and fast rules have been developed to govern the trial court's discretion. E.g. Tully v. Mott Supermarkets, Inc., 540 F.2d 187 (3d Cir.1976). In other areas, however, the district court has broad discretion in deciding whether it should exercise jurisdiction over a non-federal claim.
 
 
 54
 Applying this "three-tiered" analysis to the Union's claim for set-off based on the 1970's loans, we conclude that the district court had jurisdiction. The "common nucleus of operative fact" test is met because the 1970's loans grew out of the relationship between the Union and the Fund, which is the subject matter of appellants' claims. Indeed, although the question has not been raised on this appeal, an inherent issue in the case, and one that the Fund might present as a contention in state court, relates to whether the 1970's loans were intended not as loans but as gifts when made. The district court impliedly recognized this possible contention by finding that the 1970's loans were not gifts. 1982 Mem.Op. at 77. This issue implicates the entire factual matrix which has now been litigated in federal court for twenty years; it would thus have to be relitigated. This alone is a sufficient "common nucleus" to satisfy Gibbs. Moreover, the set-off claim strikes us as an example of the kind of claim that a "litigant in a state court would ordinarily expect to try in a single judicial proceeding." Gibbs, 383 U.S. at 725, 86 S.Ct. at 1138. Except for the years involved, the critical background factual issues with respect to liability are the same.
 
 
 55
 Turning to the second level, we also find no substantive federal policy that requires that federal jurisdiction not be exercised over the Union's claim for set-off. Both Aldinger and Owen appear to have been motivated by a concern that pendent or ancillary jurisdiction was being used to subvert statutory limits on federal jurisdiction, in Aldinger civil rights jurisdiction (Sec. 1343(3)), and in Owen diversity jurisdiction (Sec. 1382). These concerns are not applicable here. Moreover, the defendant, and not the plaintiff, is raising the ancillary claim in this case. The plaintiff is not attempting to "manufacture" federal jurisdiction in any sense. Additionally, the relevant statutes, jurisdictional and substantive, do not appear to in any way exclude jurisdiction over the Union's set-off claim. There is no important statutory policy at issue here to counterbalance the interest of the litigants and the judicial system in resolving the entire controversy in a single proceeding.
 
 
 56
 Finally, there are no prudential reasons evident from the record which would require that the district court decline to exercise jurisdiction. Because the claims must be liquidated in order for the exception to apply, the federal court is not required to apply state law in assessing damages except in the most mechanical fashion. In addition, since there is no affirmative recovery, the federal court does not get involved in state debt collection. Federalism concerns, therefore, are not strongly implicated. Since the defensive set-off by definition is only determined if the plaintiff wins on the underlying claim, adjudicating the set-off claim places little additional strain on judicial resources. In the case of a "defensive set-off" such as this, it is highly unlikely that there would be prudential factors sufficiently weighty to lead a district court to exercise its discretion to decline jurisdiction. Thus, the district court had the power and did not abuse its discretion in exercising jurisdiction over the set off for the 1970's loans.
 
 
 57
 We turn, finally, to appellant's assertion that loans advanced in 1975 and 1976, totalling $4,000,000, have not matured and are thus unavailable for set-off.[58] The Pennsylvania courts have concluded that formal demand is not a prerequisite to the institution of suit on a demand note. Gorden v. Mohawk Bond & Mortgage Co., 317 Pa. 257, 176 A. 422 (1935); Dominion Trust Co. v. Hildner, 243 Pa. 253, 90 A. 69 (1914); J.G. Valiant Co. v. Pleasonton, 108 Pa.Super. 197, 164 A. 143 (1933), aff'd, 311 Pa. 587, 167 A. 330. We can see no reason why it should be otherwise. The Fund through its trustees is party to this suit and fully aware of the claim for set-off. A formal "demand" is unnecessary to give the Fund notice that the Union is asserting a set-off based on the loans in question.
 
 
 58
 Having determined that there is federal jurisdiction over the Union's asserted set-off based on the 1970's loans, and that those loans have matured, there is no impediment to the set-off of those loans. Since the 1970's loans were never forgiven, the questions concerning the intent of the Union are not relevant. The transactions were structured as loans, and the Fund assumed the obligation to repay. This is sufficient to negate any but the strongest evidence that the Union's intent was anything other than to make a loan, and there is no such evidence. We conclude, therefore, that the 1970's loans are available for set-off in their entirety.
 
 IV. CONCLUSION
 
 59
 The district court found the Union liable for $7,589,296.63 in delinquencies. We have held that the district court did not abuse its discretion in denying appellants' claims for pre-judgment interest. The Union's liability, therefore, in no event could exceed the amount found by the district court. The district court found over $13,000,000 in loans from the Union to the Fund to be available for set-off. We affirm the holding of the district court as to the 1950's, 1960's, and 1970's loans. There is, therefore, at least $12,634,000.00 available for set-off.[59] Given these conclusions, the minimum amount available for set-off far exceeds the maximum amount of the Union's liability.
 
 
 60
 The judgment of the district court in favor of the Union will be affirmed.
 
 
 
 *
 Honorable Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The case has come before us previously in Nedd v. United Mineworkers of America, 332 F.2d 373 (3d Cir.1964); Nedd v. United Mineworkers of America, 400 F.2d 103 (3d Cir.1968) ("Nedd I" ); and Nedd v. United Mineworkers of America, 556 F.2d 190 (3d Cir.1977) ("Nedd II" ). This opinion might be denominated "Nedd III" were it not for a substitution of named plaintiffs which took place in 1981, due to the deaths of some of the original named plaintiffs
 We take this opportunity to express the highest praise for Chief Judge Nealon, who has labored most ably and indefatigably throughout the course of this arduous litigation.
 
 
 [2]
 The Union challenges the district court's conclusion that it was liable for the delinquencies of twenty-one operators that had not signed the collective bargaining agreement (the "non-signatories"). In reaching this conclusion, the court pointed to evidence that the Union and the trustees considered those operators to be bound by the collective bargaining agreements, and that the non-signatory operators complied in part with the terms of the collective bargaining agreements, thus implicitly accepting the terms of those agreements. The district court acknowledged that the caselaw establishes that independent trustees would not have had any legal recourse available to force payments of royalties from these operators, Walsh v. Schlecht, 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977), and would not have breached any fiduciary duty for failure to make efforts to collect such royalties. The court nonetheless held that the Union could be liable if it had failed to use its leverage to obtain the signatures of non-signatories that it considered to be bound by the contract. The court saw this as a duty imposed on the Union as fiduciary, which derived from a trustee's duty to inform employees of signatory operators when the operator's actions threaten the employee's eligibility to participate, and from the duty of a trustee to preserve the trust fund. Nedd v. United Mine Workers of America, 506 F.Supp. 891, 900 (M.D.Pa.1980). The court concluded that the Union was liable because, under the burden of proof imposed by Nedd II, the Union had not met its burden of proving that it took reasonable steps to make the royalty obligations enforceable on non-signatories (by attempting to obtain their signatures to the collective bargaining agreement). 506 F.Supp. at 900 n. 27
 In reviewing this conclusion, the primary question is whether, as a matter of law, the Union could be held liable in its role as trustee for the "delinquencies" of operators who had not signed the collective bargaining agreement. The court is divided on that question, but our resolution of the primary issues discussed infra, which renders the set-off to which the Union is entitled far greater than the amount of its liability, makes it unnecessary for us to resolve it. If the union sought affirmative recovery for its set-off, we might, at all events, be obliged to determine this issue so as to fix the amount of the Union's liability, but it is clear beyond peradventure that the Union seeks no affirmative recovery. The Union has also challenged the district court's holding that its actions "caused" the losses to the Fund attributable to the delinquencies of two individual operators, Diamond Coal Company and No. 9 Coal Company. Our resolution of the case makes it unnecessary for us to reach those issues. Other than the challenges mentioned in the text and in this footnote, no issue concerning the Union's liability was appealed.
 
 
 [3]
 We do not reach the issue of whether the loans made by Districts 1, 7, and 9 of the Union were also available for set-off. See infra note 21 and accompanying text
 
 
 [4]
 For example, under an enforcement program established in 1951, local union officials investigated delinquencies in operator payments in their districts, and sought to enforce collections. Between 1953 and 1962, the Union conducted thirty-one strikes against delinquent operators, designed to effect collection of delinquencies. Most of these activities were ineffective. In 1962 and 1963, however, following extended strikes, various operators entered into letter agreements with Union officials, which brought substantial payments of overdue amounts into the Fund. During this period, the trustees pursued parallel enforcement actions in court. Between 1954 and 1962, the trustees brought approximately thirty suits against delinquent operators in state court. These efforts were largely ineffective. From 1964 to 1968, the trustees shifted their activities to federal court, bringing thirty-seven suits against delinquent operators. These suits were notably more effective in securing payment than those brought in the 1950's
 
 
 [5]
 Between 1951 and 1953, the Union loaned $3,795,000 to the Fund. During the same period, Union Districts 1, 7, and 9 loaned $613,324 to the Fund. These loans were cancelled in 1959. In 1960 and 1961, the Union loaned the Fund $2,885,000, which was forgiven in 1970. From 1974 to 1977, another $5,954,000 was loaned to the Fund by the Union. These loans remain outstanding
 
 
 [6]
 The activities of the pensioned miners groups are described in Thomas v. Honeybrook Miners, Civ. No. 8499 (M.D.Pa. April 13, 1973)
 
 
 [7]
 The first complaint in this case alleged diversity jurisdiction. That suit was dismissed for lack of complete diversity. Nedd v. United Mine Workers of America, 225 F.Supp. 750 (E.D.Pa.1963), aff'd, 332 F.2d 373 (3d Cir.1964) (per curiam ). The suit was renewed on January 21, 1965 in the Middle District of Pennsylvania. Jurisdiction was based on section 301 of the Taft-Hartley Act, 29 U.S.C. Sec. 185 (1976). On appeal, we held that this suit should have been dismissed because the duty alleged to have been breached did not arise from a collective bargaining agreement, and thus did not fall within section 301. Nedd I, 400 F.2d at 106. The decision in Nedd I, however, allowed the plaintiffs to amend their complaint. The complaint was then amended to specify a new basis for federal jurisdiction and to join the trustees, who were held to be necessary parties, as defendants
 
 
 [8]
 Section 185(a) states:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 
 
 [9]
 Section 186(c) reads in relevant part:
 (c) The provisions of this section [proscribing payments by an employer to an employee representative] shall not be applicable...
 (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families, and dependents... Provided, That ... (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employees and the representatives of employees may agree upon....
 
 
 [10]
 Relying on our decision in Nedd I, the court rejected the plaintiff's first theory, breach of the collective bargaining agreements, because the collective bargaining agreements imposed no contractual obligation upon the trustees and therefore jurisdiction over them could not be maintained under section 301. 1976 Mem.Op. at 37-43. The second theory, based on the "duty of fair representation," was rejected on the basis of Allied Chemical and Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), which declined to extend the duty of fair representation to retirees. 1976 Mem.Op. at 43-53. The court rejected the third theory as to both the Union and the trustees (who were also named as defendants in the amended complaint), holding that the jurisdictional provision, section 302(e), created jurisdiction only to provide prospective relief. 1976 Mem.Op. at 27-36. Having held that the federal theories did not confer jurisdiction, the court also dismissed the pendent state claim
 
 
 [11]
 556 F.2d at 209. The district court also found that none of the trustees responsible for the liability-creating conduct were still living, and held that the successor-trustees could not be held liable. 1976 Mem.Op. at 102. This holding has not been challenged
 
 
 [12]
 556 F.2d at 210. We found that this "burden shifting" rule was supported by Pennsylvania authority, citing Estate of Stetson, 463 Pa. 64, 345 A.2d 679 (1975), and that it was an "appropriate federal rule of fiduciary obligation as well." 556 F.2d at 210-211
 
 
 [13]
 Nedd v. United Mineworkers of America, 488 F.Supp. 1208 (M.D.Pa.1980). The prejudgment interest claim was rejected by application of a four-factor balancing test which the court found to be applicable under both federal and Pennsylvania law. 488 F.Supp. at 1211-1224
 
 
 [14]
 Nedd v. United Mineworkers of America, 506 F.Supp. 891 (M.D.Pa.1980)
 
 
 [15]
 The appellants' evidence concerning the amount of delinquencies consisted primarily of the Fund's "ledger cards." The ledger cards included the monthly production reports filed by the operators with the Pennsylvania Department of Mines. The Union argued that the reports could, for several reasons, be inflated, and argued that the court should look to other evidence, including the operator's reports to the Fund, to determine the operators' production. The court found the appellants' evidence of case production to be more reliable. 506 F.Supp. at 895-898
 
 
 [16]
 See supra, note 2
 
 
 [17]
 Ambromovage v. Thomas, Civ. No. 8796 (M.D.Pa. July 9, 1982) [hereinafter "1982 Mem.Op."]. New named plaintiffs had been substituted for Nedd, et al. See supra, note 1
 
 
 [18]
 It is unclear why the Union limited its challenge to nine operators, though these nine operators accounted for approximately two-thirds of the total scope of liability
 
 
 [19]
 See supra, note 2
 
 
 [20]
 The district court originally set the liability at about $8.1 million, but subsequently reduced that figure due to its correction of a mathematical error
 
 
 [21]
 The district court apparently applied the same analysis to these "district loans" as it did to the 1950's loans. Although we need not reach the issue, we see no apparent error in the district court's analysis
 
 
 [22]
 As noted above, the prejudgment interest issue was covered by the district court in a separate published opinion, Nedd v. United Mine Workers of America, 488 F.Supp. 1208 (M.D.Pa.1980). See supra, note 13
 
 
 [23]
 In advancing their theory of "interest damages," appellants analogize the causes of action in contract that the Union could have pursued against the delinquent operators to interest-bearing bonds. They point out that if a trustee lost such bonds he would be clearly liable for the interest accruing on the bonds, and assert that the Union qua trustee similarly should be held liable for interest on the causes of action "lost" by the running of the statute of limitations, since interest would have been awarded as of right on those causes of action had the Union pursued them to judgment. See Palmgreen v. Palmer's Garage, 383 Pa. 105, 117 A.2d 721 (1955) (interest is due on ascertainable damages arising out of contract as of right from date of breach); Anderson v. Automobile Fund, 258 Pa.Super. 1, 391 A.2d 642 (1978) (same). Assuming arguendo that the analogy is sound, we cannot accept appellants' premise that under any circumstances a trustee who lost an interest-bearing note would be charged for the interest. That question would be one upon which the equity court could exercise its discretion. If, for example, the trustee had made an interest-bearing loan to the Fund, and the loan had been of the same principal amount and interest rate as the lost bond, and the trustee had forgiven the loan shortly after the bond was lost, the court could in its discretion decide that no prejudgment interest should be assessed. Given the Union's loans to the Fund, discussed below, the facts of this case are not dissimilar from the hypothetical
 
 
 [24]
 Appellants concede that the remedies overlap, and that an award of pre-judgment interest (as opposed to "interest damages") is within the equity court's discretion
 
 
 [25]
 The question of interest on a judgment arising out of the pendent state law claims would be decided in accordance with state law; in connection with the federal claims, federal law is applicable. Because we see no difference between the federal and state rules regarding the court's discretion to grant pre-judgment interest, we deal with the two together
 
 
 [26]
 The Pennsylvania Supreme Court subsequently reviewed the chancellor's denial of prejudgment interest and found it to be an abuse of discretion. Sack v. Feinman, 495 Pa. 100, 432 A.2d 971 (1981)
 
 
 [27]
 In Rodgers v. United States, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947), the Supreme Court held that interest on penalties imposed for violations of crop quotas under the Agricultural Adjustment Act was not available, because an award of interest would be inconsistent with the Act's purpose to deter nonconforming behavior rather than to raise revenues. The interest award would have disturbed the penal scheme created by Congress, which mandated specific penalties. The purposes of the provisions of the Taft-Hartley Act under which this lawsuit proceeded is the protection of pension beneficiaries and union members. It would not be inconsistent with these purposes to award aggrieved members of those protected classes interest on lost income
 
 
 [28]
 Accord Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962) (private action under Securities Exchange Act); Thomas v. Duralite, 524 F.2d 577, 589 (3d Cir.1975) (private action for securities fraud); Lodges 743 & 1746, International Association of Machinists and Aerospace Workers v. United Aircraft Corp., 534 F.2d 422, 446-47 (2d Cir.1975), cert. denied, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976) ("In suits for breach of labor agreements, as in other areas, a vital ingredient in the determination whether to award prejudgment interest is a desire to make whole the party injured by the breach, but in appropriate circumstances, compensatory principles 'must be tempered by an assessment of the equities.' ")
 
 
 [29]
 In admiralty, exceptional circumstances justifying a denial of prejudgment interest "exist only when the district court concludes that the party requesting interest has (1) unreasonably delayed in prosecuting its claim; (2) made a bad faith estimate of its damages that, precluded settlement, or (3) not sustained any actual damages." Bankers Trust, 658 F.2d at 108
 
 
 [30]
 In Eazor Express, we approved a discretionary award of prejudgment interest on unliquidated damages for a contract violation under section 301. Although we stated the "general rule" that prejudgment interest is available on liquidated damages as of right in a contract suit, we had no occasion to consider whether prejudgment interest under federal common law is discretionary or mandatory, and the statement relied upon by appellants is dictum
 Two months after Eazor Express, we endorsed the federal rule allowing discretion in Thomas v. Duralite: "Interest is not to be recovered merely as compensation for money withheld, but, rather, in response to considerations of fairness. It should not be imposed when its exaction would be inequitable." 524 F.2d at 589. In any event, the supposed "general rule" for contract suits would not apply to this case, where the court is sitting in equity.
 
 
 [31]
 See supra, note 5
 
 
 [32]
 The court noted initially that, in terms of compensation, interest consisted of a component of real growth or income production and a component for inflation. Relying on Norte & Co. v. Huffines, 416 F.2d 1189 (2d Cir.1969), cert. denied, sub nom. Muscat v. Norte & Co., 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970), the court concluded that an award of interest for the income-producing component would be unjustified because the Fund did not accumulate assets for investment purposes, but instead paid out immediately in pension benefits whatever funds it had on hand. An award for income-production capacity would, the district court concluded, put the Fund in a better position than it would have been in had the royalties been paid when due and promptly distributed to beneficiaries. We do not accept this analysis. Although the Fund would not have invested the royalties, the money would have been distributed to the beneficiaries in the event that the royalties had been paid. Although the beneficiaries would have probably spent the money on consumption rather than invested it, they would still have benefitted from the "time-value" of having that money at the time the royalties were due, rather than after twenty-one years of litigation. In the market, consumers must be compensated for delaying consumption. This compensation is reflected in the interest rate. See P. Samuelson, Economics, at 602, 613-14 (10th ed. 1976) (effect of consumer "impatience" in determining interest rates). This demand for "compensation" for delaying consumption is the same phenomenon, whether the individual involved is accepting the market rate of compensation for not consuming (i.e., investing and receiving a profit) or rejecting it (i.e., forgoing the available "profits" and consuming). There is no principled reason for compensating parties who generally find the rate of compensation sufficient to defer consumption (investors), and denying compensation to parties who find that rate insufficient (consumers)
 
 
 [33]
 The court noted that there was no "unjust enrichment" of the Union, since the uncollected royalties were not diverted into the Union's coffers. It is unclear how this was factored into the court's ultimate decision, except that it did not cut against the Union
 
 
 [34]
 Those findings appear in the 1976 Mem.Op. The decision in that case was reversed on other grounds
 
 
 [35]
 In its ultimate determination, the district court found the Union liable for $296,000 more than the amounts of the 1950's and 1960's loans, including the amounts loaned by Districts 1, 7, and 9. The rough parity between just these two amounts, along with other equitable considerations, justifies the district court's exercise of discretion in this case. Appellants assert that the 1980 value of the delinquencies is $48,974,366.69, while present value of the 1950's and 1960's loans is $28,916,137.69. Appellants calculated this disparity assuming that the Union would be liable for the entire amount of its potential liability, $9.8 million. The assumption of a liability of $9.8 million, however, is fatal to appellants' analysis, given the district court's determination that the Union is liable for only $7,589,296.63. The disparity in current dollars would be considerably smaller if the Union's actual liability was used. And, if the 1980 value of the 1970's loans is also included, the disparity would be further reduced, and probably eliminated entirely
 
 
 [36]
 Although Nedd II, in its discussion of the gift issue, concentrated on the intent of the Union at the time of forgiveness, the district court properly looked at both the time the loans were made and the time they were forgiven
 
 
 [37]
 Districts 1, 7 and 9 loaned an additional $613,324, which was also forgiven. We do not reach the issue whether or not these loans were intended as gifts. See supra, note 21
 
 
 [38]
 In Nedd II, we held that the Union breached its duty to the Fund's beneficiaries under all four legal theories advanced by the beneficiaries. Three of those theories were federal and one was a pendent state-law breach of trust theory. Accordingly, we did not decide whether state or federal law trust standards would govern in this case, although we advanced a suggestion that federal common law under Sec. 302 of the LMRA would likely preempt any inconsistent state law. 556 F.2d at 205 n. 31. Cf. Hotel and Restaurant Employees and Bartenders International Union Local 54 v. Danziger, 709 F.2d 815 (3d Cir.1983) (N.J. Casino Control Commission's power to investigate union officials in casino industry and to force officials with ties to organized crime to resign from Union held preempted by NLRA), prob. jur. noted, --- U.S. ----, 104 S.Ct. 479, 78 L.Ed.2d 677. In this case, the question again arises whether the law of gifts to be applied in determining whether set-off is precluded is a federal law of gifts, see Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) or Pennsylvania law. We do not distinguish them in the text because we think that state law does not conflict with federal policies. We look to federal law as applied under the tax code as well as to state law, because, like tax cases, this case presents an unusual question of legal characterization. We think that this question of characterization would be answered by the Pennsylvania courts as we have answered it. Accordingly, we need not decide whether federal or state law governs
 
 
 [39]
 The plaintiff in Feeley was a veteran. Following an accident involving a mail truck, he was treated at government expense under a veterans' benefit statute. He sued the government under the Federal Tort Claims Act. We held that the plaintiff was not entitled to damages to account for the value of his medical treatment, because the veterans benefits were not a "gift" under Pennsylvania law
 In Feeley, we found the Pennsylvania Supreme Court's decision in Gaydos v. Domabyl, 301 Pa. 523, 152 A. 549 (1930), to be instructive. In Gaydos, a wrongful death action, the plaintiff was not allowed to recover for the loss of support from his deceased parents, because plaintiff was an inmate of a county home, and his parents would have been absolved of their duty of support had they lived. This case, we concluded, supported the proposition "that statutory benefits furnished to the needy by a government are only intended to insure that certain minimum needs are fulfilled and are not intended as a gift in the form of an additional bounty on the recipient." Feeley, 337 F.2d at 932.
 In Feeley, we also canvassed Pennsylvania cases considering whether lost wages were to be assessed against a tortfeasor if the victim continued to receive his customary wages from his employer while off the job. See, e.g., Palandro v. Bollinger, 409 Pa. 296, 186 A.2d 11 (1962); Kite v. Jones, 389 Pa. 339, 132 A.2d 683 (1957); Pensak v. Peerless Oil Co., 311 Pa. 207, 166 A. 792 (1933). Although these cases do not present a totally consistent approach, Pennsylvania appears to have fashioned the rule that such payments preclude recovery for wages in the amount of the payments, unless the victim can show that they were intended to be gifts. But see Stevenson v. Pennsylvania Sports & Enterprises, Inc., 372 Pa. 157, 93 A.2d 236 (1952) (plaintiff's damages are not diminished by a "noncontractual and noncompulsory contribution" by the employer; opinion of trial court, adopted by Supreme Court, did not address whether proof of donative intent had been adduced.)
 
 
 [40]
 Under Pennsylvania law an unexplained transfer of property from a parent to a child raises an inference that a gift was made, relieving the proponent of his normal burden to prove donative intent and shifting the burden to the opponent to negate donative intent. See Northern Trust Co. v. Huber, 274 Pa. 329, 118 A. 217 (1922); In re Yeager's Estate, 273 Pa. 359, 117 A. 67 (1922); Kohr v. Kohr, 271 Pa.Super. 321, 413 A.2d 687 (1979). The courts have reasoned that children are the "natural objects" of a parent's bounty, and from this general observation have supplied a presumption concerning the motives of the transferor
 
 
 [41]
 See supra, note 39, concerning the Pennsylvania case law on "gifts" from employers. In the context of taxable income, the Supreme Court has also looked to the nature of a relationship in determining whether a transfer is a gift. See Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) (factfinder entitled to determine that transfer of car from one businessman to another, in appreciation of business information, was not a "gift," in spite of absence of legal obligation); id. at 296, 80 S.Ct. at 1202 (Frankfurter, J., concurring and dissenting) ("While we would normally suppose that a payment from father to son was a gift, unless the contrary is shown, in the two cases before us the business implications are so forceful that I would apply a presumptive rule placing the burden upon the beneficiary to prove the payment wholly unrelated to his services to the enterprise"). Although the standard for a "gift" in a tax case is somewhat different from the common-law test of donative intent, the use of relationship to create a presumption is roughly the same
 
 
 [42]
 On the facts of this case, it is possible to derive conflicting inferences from the relationship between the Union and the Fund. In Nedd II, we suggested that if the Union's purpose in forgiving the debts was to make restitution for failures to collect delinquent royalties, there would have been no gift, notwithstanding that the cancellations were effected voluntarily and without consideration. Such a purpose would be entirely consistent with the Union's relationship with the Fund. We also noted, however, that the Union's position was analogous to that of a settlor-trustee. To the extent that this analogy is accurate, the relationship between the Union and the Fund is one in which "gifts" would presumably be given
 
 
 [43]
 Appellants assert that our review of this issue is plenary because it is a "mixed question of law and fact." To the extent that we review the district court's findings of fact, we do so under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). We think the question whether the Union intended a gift is one of fact. Cf. Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (discriminatory intent vel non under Title VII is a finding of fact, to be reviewed under the Rule 52(a) standard)
 
 
 [44]
 Appellants in their reply brief suggest that the Union's motivation for cancelling the loans was its political accountability to its pensioned members. Even if this were the Union's purpose, we think that "true donative intent" as we have outlined it, would not necessarily be present
 
 
 [45]
 Under Fed.R.Civ.P. 13, there are two types of counterclaims: compulsory (Rule 13(a)) and permissive (Rule 13(b)). Compulsory counterclaims are defined as those "aris[ing] out of the transaction or occurrence that is the subject matter of the opposing party's claim." Claims arising out of a different transaction, on the other hand, are permissive counterclaims. The 1970's loans, coming after the union had extricated itself from unlawful control of the Fund, are asserted not to have arisen out of the same transaction or occurrence as the appellants' claims against the Union. We need not decide whether or not this assertion is correct and will assume it for purposes of argument
 
 
 [46]
 Unlike the 1950's and 1960's loans, the 1970's loans have not been forgiven
 
 
 [47]
 The origins of this exception are not totally clear. Professor Moore stated the exception in the first edition of Moore's Federal Practice, without any supporting cases. The exception has since been recognized by a number of district courts, and acknowledged in dicta by two courts of appeals. E.g., Curtis v. J.E. Caldwell & Co., 86 F.R.D. 454 (E.D.Pa.1980). See United States v. Heyward-Robinson Co., 430 F.2d 1077, 1081 n. 1 (2d Cir.1970), cert. denied, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); Revere Copper & Brass, Inc. v. Aetna Casualty & Surety Co., 426 F.2d 709, 715 (5th Cir.1970); 3 J. Moore, Moore's Federal Practice p 13.19 (2d ed. 1983)
 
 
 [48]
 See Owen Equipment and Erection Co. v. Kroger, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The two doctrines are derived from different historical antecedents. The term "ancillary jurisdiction" has traditionally been used to refer to federal jurisdiction over claims other than those of the plaintiff, such as compulsory counterclaims, cross-claims, impleader claims, and the claims of a party intervening as of right. Ancillary jurisdiction is derived from the notion that, once a federal court acquires jurisdiction over property, all claimants to the property must be able to litigate their claims in that federal court. See Freeman v. Howe, 65 U.S. (24 How.) 450, 16 L.Ed. 749 (1861). The scope of ancillary jurisdiction was later expanded to include cases in which three was no particular "property" involved, except for the claim. Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). "Pendent jurisdiction" generally refers to a federal court's jurisdiction over the plaintiff's non-federal claims, as long as there is a federal claim which gives the court jurisdiction. The modern theory of pendent jurisdiction is derived from the policy of providing a federal forum to decide federal disputes. Where a federal claim and a state claim arise from the same set of facts, the provision of a federal forum to resolve the federal claim will be ineffective unless the federal court can also resolve the state claim, because litigants will, in practical terms, be unable to avail themselves of the federal forum. In Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), the court allowed a pendent claim to be heard in federal court where the federal court had exclusive jurisdiction over the federal claim. If the state-law claim could not also be heard, there would have been no forum in which both the state and federal claims could have been raised. This rule was expanded in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), to eliminate the requirement that the federal court have exclusive jurisdiction over the federal claim
 
 
 [49]
 This approach is expounded in Note, A Closer Look at Pendent and Ancillary Jurisdiction: Toward a Theory of Incidental Jurisdiction, 95 Harv.L.Rev. 1935 (1982) (hereinafter "Incidental Jurisdiction" ). We decline to adopt the term "incidental jurisdiction" therein proposed, but rather use the traditional terms, though conceding that they overlap and are often interchangeable. We also decline to endorse all the analysis of Incidental Jurisdiction in its details. We do, however, find the general approach of the Note to be an intelligent way of systematizing the decisions in this area. We note that the analysis under the three separate tiers need not, of course, be performed by the courts in the order in which they are presented here. To the contrary, where the jurisdictional issue can be resolved without deciding constitutional questions, the courts should make every effort to do so
 
 
 [50]
 Our holding on this point is, of course, limited to situations in which the ancillary or pendent claim is attached to an underlying claim based on federal question jurisdiction. Although it is doubtful that the tensions between the concerns of federalism and the need for judicial economy should be resolved differently when a jurisdictional statute is founded on another font of federal jurisdiction, we need not decide those issues today
 
 
 [51]
 See Owen Equipment, supra note 48
 
 
 [52]
 See Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976)
 
 
 [53]
 The discretion to not exercise pendent jurisdiction was established in Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139. This discretion may be exercised in order to promote convenience, judicial economy, and fairness to litigants, and to protect interests of federalism. See Incidental Jurisdiction, supra note 49, at 1938
 
 
 [54]
 The words "transaction or occurrence" are not derived from Gibbs, or any other jurisdictional test, but rather appear to have originated with the Restatement of Judgments, which employs the term "transaction" in the test for res judicata. See Restatement (First) of Judgments Sec. 61. The "transaction or occurrence" test is thought to derive from the same policies that motivated the Gibbs language requiring that pendent claims be "such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding." 383 U.S. at 725, 86 S.Ct. at 1138. The latter phrase is generally taken to mean that the failure to raise a related state claim would be res judicata in a subsequent action. See Restatement (Second) of Judgments Sec. 24 comment b. We decline, however, to hold that Rule 13(a) is coextensive with Gibbs
 
 
 [55]
 See, e.g., Note, The Res Judicata Implications of Pendent Jurisdiction, 66 Cornell L.Rev. 608, 614 n. 25 (1981)
 
 
 [56]
 Cf. United States v. Heyward-Robinson Co., 430 F.2d 1077, 1088 (2d Cir.1970) (Friendly, J., concurring), cert. denied, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). Judge Friendly urged that United Mine Workers v. Gibbs required reconsideration of the Second Circuit rule that a permissive counterclaim required an independent ground of subject matter jurisdiction. See O'Connell v. Erie Lackawanna R.R., 391 F.2d 156, 163 (2d Cir.1968). Even in the Second Circuit, the independent-ground-of jurisdiction rule is recognized as inapplicable to set-offs. See United States v. Heyward-Robinson Co., 430 F.2d at 1081 n. 1
 We note too that the defensive set-off exception does not fit squarely within the analytic framework set forth in the text. Judge Friendly has written that the set-off exception "carries the seeds of destruction of the so-called general rule (that there is no ancillary jurisdiction over a permissive counterclaim)." Heyward-Robinson, 430 F.2d at 1088 (Friendly, J., concurring). Presumably, Judge Friendly envisions a scenario under which the courts recognize that there is no principled basis for treating set-offs differently from other permissive counterclaims for jurisdictional purposes. Since under the exception all defensive set-offs, whether or not they satisfy the Gibbs test, are within the ancillary jurisdiction of the court, the ultimate result would be to allow all permissive counterclaims to be heard in federal court under the rubric of ancillary jurisdiction.
 
 
 [57]
 This analysis assumes, as we think it should, see Gibbs, that where Congress has not spoken to the contrary or where we cannot find a Congressional intent to the contrary, jurisdictional statutes give federal courts the power to exercise ancillary and pendent jurisdiction to the constitutional limit
 
 
 [58]
 Appellants have cited two cases for the proposition that, where a note is payable on demand or upon the happening of some future condition, actual demand is necessary to mature the note. See Blick v. Cockins, 131 Md. 625, 102 A. 1022 (1917); Shapleigh Hardware Co. v. Spiro, 141 Miss. 38, 106 S. 209 (1925); see also Annot., 71 A.L.R.2d 284, at Sec. 8, and cases cited therein. These cases deal with the question when the statute of limitations begins to run on a note. In the case of a signed demand note, the note is deemed to mature at its making, and the statute runs from that time. See U.C.C. Sec. 3-122 (1972). In the cases cited by appellants, the courts found an intention in the parties' agreement that the note was to mature in fact at a later date, so that the statute ran either from that date or from the date of an actual demand. These cases have no bearing on the question whether institution of suit can constitute a demand
 
 
 [59]
 The reason that we find a smaller amount available for set-off is that we do not reach the question of the loans made by Districts 1, 7, and 9. See supra note 21