Paul **KALMANOVITZ, individually and as a shareholder of Pabst Brewing Company, and S & P, Inc., a California corporation, Plaintiffs,**

v.

**G. HEILEMAN BREWING COMPANY, INC., a Wisconsin corporation, Russell G. Cleary, HBC Acquisition, Inc., a Delaware corporation, Pabst Brewing Company, a Delaware corporation, and William F. Smith, Jr., Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay, Defendants.**

Civ. A. No. 82–797.

United States District Court,
D. Delaware.

April 8, 1986.

---

Peter M. Sieglaff and W. Laird Stabler of Potter, Anderson & Corroon, Wilmington, Del., for plaintiff Paul Kalmanovitz.

R. Franklin Balotti and Jesse A. Finkelstein of Richards, Layton & Finger, Wilmington, Del., and James A. Quinn, Joseph S. Allerhand and Richard B. Friedman of Weil, Gotshal & Manges, New York City, of counsel, for defendants, Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay ("the Jacobs Group").

LATCHUM, Senior District Judge.

The procedural history of this case may be found in this Court's prior opinion dated November 21, 1983. *Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 576 F.Supp. 922 (D.Del.1983), *aff'd*, 769 F.2d 152 (3d Cir.1985). The sole remaining issue for determination is the claim by plaintiff, Paul

Kalmanovitz[1] ("Kalmanovitz"), against the defendants Irwin Jacobs, Dennis Mathisen, Gerald Schwalbach, and Daniel T. Lindsay (collectively the "Jacobs Group"), for breach of contract dated October 26, 1982, as supplemented by a letter agreement of November 18, 1982. Kalmanovitz seeks a judgment against the Jacobs Group for $7,751,937 consisting of the following elements: (1) $3,785,812 representing 50% of the price difference between $24 per share and $32 per share on 83% of 1,140,305 shares of Pabst tendered to G. Heileman Brewing Co. ("Heileman") by the Jacobs Group on December 23, 1982, (2) $3,750,000 representing 50% of the $7,500,000 received by the Jacobs Group from Heileman and Pabst pursuant to the November 26, 1982 Settlement Agreement between those parties, and (3) $216,125 representing Kalmanovitz's out-of-pocket expenses incurred in connection with the Jacobs Group's attempt to take control of Pabst, allegedly due him under paragraph 5 of the October 26, 1982 agreement between Kalmanovitz and the Jacobs Group.

The case was tried to the Court without a jury on August 12, 1985, and post-trial briefing by the parties was completed on December 16, 1985. This opinion constitutes the Court's findings of fact and conclusions of law as permitted by Rules 52(a), Fed.R.Civ.P.

## I. THE FACTS

During late 1977 and early 1978 and again between July 1981 and October 1982, Kalmanovitz held several exploratory meetings and discussions with senior managers of Pabst concerning: the possible merger of Pabst with a company indirectly owned by Kalmanovitz, a possible acquisition by Kalmanovitz of a substantial equity interest in Pabst, and Kalmanovitz's purchase of 80 percent of Pabst's stock, with Pabst senior management to receive 20 percent, making Pabst a private company. No agreement, however, was ever reached on these proposals. (PX 1, ¶¶ 1–3.)[2]

In November, 1980, the Jacobs Group began making substantial purchases of Pabst stock, and by October 1982, the Jacobs Group owned 1,140,305 of the 8,185,541 Pabst shares then outstanding. (Id., ¶¶ 4 & 5.) Between December, 1981 and October, 1982, the Jacobs Group made a series of unsuccessful attempts to acquire control of Pabst, including a proxy contest, a tender offer, and the solicitation of shareholder consents. (PX 1, ¶ 4; Tr. 28–29.) Then in October, 1982, the Jacobs Group found a partner to assist it in its continuing efforts to acquire Pabst. (PX 1, ¶ 6.) The partner was Kalmanovitz, who was known to the Jacobs Group as someone who was "in the brewery business." (Tr. 34, 90, 91.)

The partnership was conceived when all four members of the Jacobs Group traveled to California in mid-October to meet Kalmanovitz at his residence. (Tr. 31.) During the preliminary discussions the Jacobs Group learned that "there was no question that he [Kalmanovitz] wanted to buy the [Pabst] brewery." (Tr. 32.) Jacobs told Kalmanovitz "basically that we [the Jacobs Group] needed money, that is what we were out looking for, and that if he [Kalmanovitz] had an interest in joining with us, we would be obliged to obviously have him do that." (Tr. 32, 33.) Based on an assumed value of $24 per share for Pabst stock, Jacobs made the following proposal to Kalmanovitz at the California meeting:

[W]e, meaning our group, would put our 1,140,000 (sic 1,140,305) shares [of Pabst] into the [acquiring] corporation, along with an additional equivalent amount of money from Mr. Kalmanovitz, or roughly $26 million in cash, and we would put our stock in and go forth on a 50/50 basis in

1. S & P is a California corporation and also a named plaintiff in the caption and is engaged in the business of investments and of owning and managing real estate whose shares are wholly owned by Kalmanovitz. (Docket Item ["D.I."] 1.) Because the parties treated Kalmanovitz as the only real party plaintiff, the Court will do likewise in this opinion.

2. "PX" refers to plaintiff's trial exhibits, "DX" refers to defendants' trial exhibits, and "Tr." refers to the transcript of trial testimony. (D.I. 205.)

going after to buy the company, as well as 50/50 partnership.

(Tr. 33.) Kalmanovitz responded that he would like to proceed as proposed by Jacobs. (Id.)

The parties and their attorneys thereafter met in New York in late October to draft a definitive contract. (Tr. 35.) The negotiation and drafting occurred at the offices of the Jacobs Group's attorneys. (Tr. 35.) There were disagreements between counsel for the Jacobs Group and counsel for Kalmanovitz during the drafting of the contract. (Tr. 35, 36.) In order to put an end to the disagreements, Kalmanovitz instructed his attorneys to agree with whatever Jacobs or his attorneys proposed. (Tr. 36, 37.) Because the drafting of the contract was placed under the control of Jacobs and his attorneys, the attorneys representing Kalmanovitz demanded and received a document from Kalmanovitz releasing them from any claim of inadequate representation. (Tr. 37.) The drafting of the contract was then completed. (Id.) Jacobs described the contract as a "complete document." (Tr. 93.)

The October 26 contract (the "Contract") was signed by all members of the Jacobs Group and by Kalmanovitz. (PX 2, p. 5.) The Contract recites that the members of the Jacobs Group collectively owned 1,140,-305 shares of Pabst and also owned all of the stock of PST Acquiring Corp. ("PST"), which in turn owned all the stock of JMSL Acquiring Corp. ("JMSL"). (PX 2, pp. 1, 2.) The Contract provides that the Jacobs Group would sell 50% of the stock of PST to Kalmanovitz and expressly gave Kalmanovitz the right to elect fifty percent of the directors of PST and JMSL. (PX 2, p. 2.) The Contract required the Jacobs Group and Kalmanovitz to cause JMSL to make a tender offer for 3,000,000 shares of Pabst stock at $24 per share. (Id.) The Contract further provided that if at least 3,000,000 shares were tendered to the JMSL offer, then the Jacobs Group would contribute their shares of Pabst to PST in exchange for 250 additional share of PST stock, and Kalmanovitz would contribute $26,394,720

in cash to PST in exchange for 250 additional shares of PST stock. (PX 2, p. 3.) In addition to various provisions describing the steps to be taken if the tender offer succeeded, the Contract provided:

> The Jacobs Group agrees that if the transactions contemplated by this memorandum of terms do not close and members of the Jacobs Group sell their shares within six (6) months, then the Jacobs Group will reimburse PK [Paul Kalmanovitz] for all of his out-of-pocket expenses in connection with the proposed transactions.

(PX 2, p. 4.)

At his deposition taken on February 1, 1984, Jacobs testified that the Contract contained everything that the parties had discussed and agreed upon. (Tr. 96.) The Contract was described by Jacobs as the product of "much discussion." (Tr. 35.) Jacobs testified at trial that he was "satisfied" with the October 26 Contract and "wouldn't have signed it" had he not been satisfied. (Tr. 98.) Jacobs also testified at trial that the Contract contained all of the agreements made during the discussions and negotiations between the parties—except one. (Tr. 92.) According to Jacobs' trial testimony, the only provision that he and his lawyers failed to put in the Contract was "that Kalmanovitz was relying completely on me to make the decisions in the future of the transaction." (Id.) This omission occurred even though Jacobs testified that Kalmanovitz instructed his attorneys "to do as he [Jacobs] tells you to do" prior to the completion of the drafting of the Contract. (Tr. 35–36.)

Nothing, however, in the Contract relegates Kalmanovitz to the subordinate role ascribed to him by Jacobs. (PX 2.) On the contrary, the equally divided stock ownership and right to elect directors refute Jacobs' claim. (PX 2, p. 2.) Mathisen, a lawyer and a member of the Jacobs Group, testified at his deposition on the question of equal division of authority between the Jacobs Group and Kalmanovitz as follows:

> [T]here was no way that JMSL could, in fact, terminate its offer without approval

from Mr. Kalmanovitz in that a resolution of the Board would have to be passed to withdraw the offer. What we could do, we knew that [the Jacobs Group's] approval and, in effect, it was to use a phrase, a "Mexican standoff" on that score.

(Tr. 154, 155.) When Mr. Kalmanovitz was asked at deposition if he ever agreed that Jacobs would be the "captain of the ship," his answer was "No, sir." (D.I. 200, p. 27.) Kalmanovitz testified that he was a "partner" who was capable of handling his part of the bargain. (*Id.*, p. 26.) Kalmanovitz also testified at deposition:

The decision how much to pay was also my decision too. We both of us agreed to it, not one man. He [Jacobs] couldn't spend my money without my approval, originally.

\*      \*      \*      \*      \*      \*

I'm no amateur when it comes to dollars and cents. I was buying breweries; he [Jacobs] was buying stock for manipulation. That's the difference. I know the values and I don't need Mr. Jacobs to tell me how much I'm willing to offer.

On October 27 JMSL commenced a tender offer for Pabst stock at $24 per share pursuant to and in accordance with the terms of the October 26 Contract. (PX 1, ¶ 15.) On November 9 Jacobs met with Kalmanovitz in Milwaukee to discuss the JMSL response to an anticipated competing tender offer by HBC Acquisitions Inc. ("HBC"), a wholly owned subsidiary of G. Heileman Brewing Company, Inc. ("Heileman"). (PX 1, ¶¶ 10, 22, 23.) At that meeting Jacobs explained that his group did not "have any additional money" to finance an increase in the JMSL offer in response to the anticipated competing HBC offer. (Tr. 40, 41.) In consideration of Kalmanovitz agreeing to arrange for additional financing that would permit JMSL to raise its offer, Jacobs agreed that if the Jacobs Group sold their shares in Pabst, they would pay Kalmanovitz fifty percent of everything over $24 per share that the Jacobs Group received for their Pabst stock. (Tr. 41, 104, 105.) At all relevant

times Jacobs had the authority to act on behalf of all four members of the Jacobs Group. (PX 1, ¶ 21.)

On November 10, 1982, the day after the Jacobs-Kalmanovitz meeting in Milwaukee, HBC announced its competing tender offer for Pabst at $27.50 per share. (PX 1, ¶ 17.) On November 17 Jacobs flew to San Francisco to discuss with Kalmanovitz the amount by which the JMSL offer of $24.00 per share should be raised to compete with the HBC offer of $27.50 per share. (PX 1, ¶ 26.) As a condition to meeting with Jacobs, Kalmanovitz insisted that Jacobs confirm in writing the Jacobs Group's agreement to provide for payment to Kalmanovitz of one-half of everything the Jacobs Group received in excess of $24 per share for their Pabst stock. (Tr. 46–48.) Jacobs reacted to the request for this written confirmation by stating, "as far as I'm concerned, we have a deal, but I said there is no problem, we will put it in writing, you know, whatever." (Tr. 46.) Jacobs also agreed that he was not coerced into giving written confirmation of his promise. (Tr. 103.)

On November 18, 1982, Jacobs delivered to Paul Kalmanovitz the following letter ("November 18 letter"):

Dear Paul,

In the event we decide that it is better for our group to sell our shares in Pabst, rather than continue to bid higher, you will receive fifty percent (50%) of all amounts in excess of $24.00 for all shares in our group.

Sincerely,
Irwin L. Jacobs

(PX 1, ¶¶ 28, 29; PX 4.) At trial, Jacobs described his November 18 letter as a document "which speaks for itself." (Tr. 101.)

After receiving the November 18 letter, Kalmanovitz agreed to provide to JMSL an additional $18,000,000 in financing so that the JMSL tender offer could be raised from $24 per share to $30 per share. (PX 1, ¶ 30.) This letter agreement was also reduced to writing on November 18 as an amendment to the Contract. (PX 3.) Ja-

cobs agreed that the consideration for the promise in his November 18 letter was the promise by Kalmanovitz on the same date to provide the required additional financing. (Tr. 104, 105.) Pursuant to that amendment and supplement to the Contract, on November 18, 1982 the JMSL offer was increased to $30 per share. (PX 1, ¶ 31.)

On November 23, 1984, Jacobs telephoned Kalmanovitz and proposed that the JMSL tender offer be increased to $35 per share. (PX 1, ¶ 33.) Kalmanovitz agreed to the proposed increase and also agreed to finance the increase by contributing an additional $15,000,000 in cash if the tender offer succeeded. (PX 1, ¶¶ 33, 35.) That agreement was also reduced to writing (PX 5), and the Contract was amended on November 23 to increase the JMSL offer to $35 per share. (PX 1, ¶ 34.)

On November 24 HBC announced that it was amending its tender offer by reducing the number of shares sought from 5,500,-000 to 4,250,000. (PX 1, ¶ 39.) Upon learning of HBC's announcement Jacobs conferred with his lawyers and concluded that the amendment to the $27.50 per share HBC offer was a "checkmate move" (Tr. 59) that would defeat the existing JMSL offer of $35 per share. (Tr. 56–59, 67–69.) On the evening of November 24 Jacobs, without consulting Kalmanovitz, called Russell Cleary, the Chairman of G. Heileman Brewing Company who was directing the HBC tender offer, to propose a "resolution" of the competing JMSL and HBC tender offers. (Tr. 58.) Jacobs and Cleary agreed that a settlement should be reached. (Tr. 58, 59, 62.) Jacobs then called Kalmanovitz and informed him that the Jacobs Group had unilaterally decided to seek a "resolution" with Pabst and Heileman. (Tr. 59, 60.) Kalmanovitz immediately concluded that Jacobs had "sold us out" to Heileman. (D.I. 200, pp. 106, 107.) Kalmanovitz was angry and responded that JMSL should continue bidding. (*Id.*) Jacobs ignored Kalmanovitz's request and called Cleary later that evening to propose the terms of a settlement. (Tr. 64.) In that telephone conversation Jacobs

told Cleary that Kalmanovitz was "a problem for you [Cleary] to deal with." (*Id.*)

On November 25 Kalmanovitz asked Jacobs, who was then in New York, to come to a meeting in California to discuss continuing the JMSL offer, but Jacobs refused. (Tr. 73, 127; D.I. 200, pp. 101, 102.) There were negotiations between lawyers representing Heileman and Jacobs during the afternoon of November 25 and the morning of November 26. (Tr. 70–75.) During the course of those negotiations Jacobs acknowledged his obligations to Kalmanovitz under the November 18 amendments to the Contract by stating to his lawyer "that if this thing [the settlement with Cleary] goes through, I have the 50% to pay Paul [Kalmanovitz]." (Tr. 74–75.)

Jacobs and Cleary on November 26, 1982, without the approval of Kalmanovitz, discussed a settlement consisting of the following four ideas: the cash portion of the HBC tender offer would be increased from $27.50 to $29 per share; the notes to be offered to shareholders in the merger that would follow the tender offer would be increased from $20 to $24 per share; the Jacobs Group would be paid $7.5 million for expenses and suggested that Kalmanovitz be paid $5 million. (Tr. 75.) Cleary promptly agreed to Jacobs' proposal but on condition that Jacobs obtain the approval of Kalmanovitz. (Tr. 76.) Kalmanovitz refused to be a party to the proposed settlement and rejected the proposal of $5 million which he considered to be a "bribe." (Tr. 78, 130.) Kalmanovitz again informed Jacobs that he wanted to continue the JMSL tender offer for Pabst. (*Id.*)

Jacobs informed Cleary that Kalmanovitz would not agree to the proposed settlement. (Tr. 80.) Jacobs also informed Cleary that the Jacobs Group would "break off from Paul Kalmanovitz" and would "support" the proposed new HBC tender offer on condition that the Jacobs Group was paid $7.5 million. (*Id.*) On that same day the Jacobs Group, Heileman, and Pabst entered into a written settlement agree-

ment (the "November 26 Settlement Agreement"). (PX 6.)

The terms of the November 26 Settlement Agreement were as follows: HBC would make a new tender offer for 5.6 million Pabst shares at $29 per share (id., ¶ 1); the face value of the notes issued to shareholders in the merger following the tender offer would be $24 (id., ¶ 4(e)); the Jacobs Group would tender all but 100 of its 1,140,305 shares of Pabst to the HBC offer; the Jacobs Group would support the HBC offer and would do nothing to encourage or facilitate the JMSL offer (id., ¶¶ 3, 7); the Jacobs Group would be paid by Heileman and Pabst $7.5 million for expenses incurred with respect to all litigation and efforts for the past two years to gain control of Pabst but that expense payment would be made only if the Jacobs Group's shares of Pabst were purchased under the HBC offer (PX 6, ¶ 8); the parties to the agreement would settle existing litigation; and the Jacobs Group would be indemnified for up to $350,000 if they were sued[3] as a result of ceasing to participate in the JMSL offer or their participation in the November 26 Settlement Agreement. (PX 6, ¶ 17.) The Jacobs Group's defense of this litigation is being paid for at least in part pursuant to the indemnification provision. (Tr. 117.)

In accordance with the November 26 Settlement Agreement, HBC made a new tender offer on December 2, 1982, for 5.6 million shares of Pabst stock at $29 per share. (PX 1, ¶ 43.) On December 1, 1982, Kalmanovitz sent a telegram to Jacobs stating that the Jacobs Group's settlement with Heileman constituted a breach of the Contract between Kalmanovitz and the Jacobs Group. (PX 1, ¶ 45; DX 10.)

On December 6, 1982, a company owned by Kalmanovitz and his wife, known as 21–115 Inc., commenced a tender offer for Pabst at $32 per share. (PX 1, ¶ 47.) On December 10, 1982, Kalmanovitz filed an action in this Court against Heileman and

Pabst seeking, *inter alia,* to enjoin them from purchasing the Jacobs Group's shares of Pabst. (*Id.,* ¶ 49.) The application for injunctive relief was denied by this Court on December 20, 1982. (*Id.,* ¶ 51.)

On December 15, 1982, HBC increased the cash portion of its tender offer from $29 to $32 per share. (*Id.,* ¶ 50.) The increase in the HBC offer was in response to the December 6 Kalmanovitz offer of $32 per share. (Tr. 146.) On December 22, Kalmanovitz increased his offer to $40 per share. (PX 1, ¶ 52.) As that increase was being announced, Kalmanovitz offered to release the Jacobs Group from their obligation to pay to Kalmanovitz 50% of the amount over $24 per share that the Jacobs Group received for their Pabst stock if the Jacobs Group would tender their stock to the Kalmanovitz offer. (Tr. 82; DX 21.) Jacobs did not respond to that offer. (Tr. 82, 83.)

On December 23, 1982, Heileman accepted for payment 5.6 million shares of Pabst stock tendered to the HBC offer of $32 per share, including 83 percent of the shares tendered by the Jacobs Group. (PX 1, ¶¶ 53, 54.) The Jacobs Group received approximately $3,000,000 more than they bargained for with Heileman as a result of the continued bidding by Kalmanovitz. (Tr. 146.)

As a result of proration of tenders to the HBC offer, Heileman purchased 946,453 of the 1,140,305 shares of Pabst stock owned by the Jacobs Group at a price of $32 per share. (PX 1, ¶ 54.) The amount received by the Jacobs Group in excess of $24 per share was $8 times 946,453 shares or $7,571,624. As previously noted, Kalmanovitz claims 50% of that amount or $3,785,812 pursuant to the November 18 letter agreement supplementing the October 26 Contract. The Jacobs Group was also paid $7,500,000 in expenses by Heileman and Pabst pursuant to paragraph 8 of the November 26 Settlement Agreement. (Tr. 22.) Kalmanovitz also claims 50% of that

---

**3.** While paragraph 17 of the November 26, 1982 Settlement Agreement does not refer to Kalmanovitz by name, it does describe a potential plaintiff that would at least encompass Kalmanovitz. (PX 6, ¶ 17; Tr. 115, 117.)

amount or $3,750,000 pursuant to the November 18 supplemental letter agreement. Finally, in connection with the unsuccessful JMSL tender offer, Kalmanovitz incurred out of pocket expenses of $216,125 for which he seeks reimbursement from the Jacobs Group pursuant to paragraph 5 of the October 26 Contract. (Tr. 22; PX 7.) The Jacobs Group has not made any payments to Kalmanovitz. (PX 1, ¶ 56.)

At trial, Jacobs testified that the reason nothing was paid to Kalmanovitz was because Kalmanovitz interfered with the Jacobs Group's right to sell its Pabst stock. (Tr. 84.) Nevertheless, Jacobs also agreed "absolutely" that the withdrawal of the Jacobs Group from the JMSL tender offer "in no way [contractually] restricted plaintiff's—that is Kalmanovitz—ability to make a competing tender offer for Pabst stock." (Tr. 85–86, 89.) When asked if he understood that Kalmanovitz had the right to continue bidding for Pabst, Jacobs replied that "He [Kalmanovitz] could do anything he wanted to." (Tr. 89.) Jacobs also testified that he and the other members of the Jacobs Group were well aware of the fact "that lawsuits go with tender offers." (Tr. 113.)

## II.  THE LAW

■ The parties have agreed and this Court has ordered that California law must be applied in constructing the contract as amended and supplemented. (D.I. 188, § V(A).) Under California law, a contract must be interpreted so as to give effect to the words used in the contract. *Apra v. Aureguy,* 55 Cal.2d 827, 830, 13 Cal.Rptr. 177, 361 P.2d 897 (1961).

Turning to the October 6, 1982 contract, paragraph 5 thereof provides:

The Jacobs Group agrees that if the transactions contemplated by this memorandum of terms do not close and members of the Jacobs Group sell their shares within six (6) months, then the Jacobs Group will reimburse PK [Paul Kalmanovitz] all of his out-of-pocket ex-

penses in connection with the proposed transactions.

(PX 2.)

The undisputed evidence before the Court indicates that the JMSL tender offer contemplated by the above quoted provision did not close, that the members of the Jacobs Group sold 83% or 946,453 shares of Pabst to Heileman in December 1982 and that Kalmanovitz incurred out-of-pocket expenses totaling $216,125 (PX 7) in connection with the JMSL tender offer. Based on the precise terms of the October 26 contract, Kalmanovitz is entitled to recover from the Jacobs Group $216,125 for these expenditures.

■ Similarly, the November 18 supplemental letter from Jacobs to Kalmanovitz is clear and unambiguous. It reads *in toto:*

Dear Paul,

In the event we decide that it is better for our group to sell our shares in Pabst rather than to continue to bid higher, you will receive fifty percent (50%) of all amounts in excess of $24.00 for all shares in our group.

Sincerely,
Irwin L. Jacobs

(PX 4.)

The credible evidence clearly indicates that Kalmanovitz received this promise from the Jacobs Group in consideration of Kalmanovitz providing JMSL an additional $18,000,000 in financing so that the JMSL tender offer could be raised from $24 per share to $30 per share. (PX 1, ¶ 30; Tr. 104, 105.) By virtue of the express terms of this supplemental agreement of November 18, when the Jacobs Group sold 83% of their Pabst shares to Heileman on December 23, 1982 for $32 per share, receiving $7,571,624 therefor, Kalmanovitz became entitled to receive 50% thereof or $3,785,-812.

■ The Jacobs Group contends that, despite the express language of the October 26 contract and supplemental letter agreement of November 18, Kalmanovitz did not become entitled to receive the out-of-pocket

expenses or 50% of the $7,571,624 which the Jacobs Group received for the sale of their Pabst shares because there was a "collateral agreement" or "understanding" that Kalmanovitz would *not* interfere with any sale of the Jacobs Group's stock in Pabst. The Jacobs Group argues that Kalmanovitz's interference with their sale of Pabst stock to Heileman was manifested when he sought to enjoin that sale in this Court and then commenced a competing tender offer. The Court finds that this "understanding" by Jacobs was entirely a subjective unilateral understanding which was not a part of the two express written agreements. This so-called understanding of Jacobs does not change the Jacobs Group's written and clear obligation to pay Kalmanovitz out-of-pocket expenses of $216,125 incurred in connection with the JMSL tender offer pursuant to Paragraph 5 of the October 6, 1982 agreement. Nor does this subjective unilateral understanding by Jacobs affect the written promise of the Jacobs Group to pay Kalmanovitz 50% of the difference in sale price of $24 and $32 per share when the Jacobs Group sold their Pabst shares to Heileman on December 23, 1982. The express language of the supplemental letter agreement of November 18, 1982 supported by adequate consideration given by Kalmanovitz in the form of an additional $18,000,-000 in financing must be enforced.

■ Finally, Kalmanovitz claims that he is entitled under the November 18 supplemental letter agreement to 50% of the $7,500,000 paid to the Jacobs Group by Heileman and Pabst under the Settlement Agreement. Kalmanovitz contends that this payment was a mere "bonus" or "premium" as a part of the purchase price for the Jacobs Group Pabst stock. The evidence, however, does not support this contention. The Settlement Agreement between the Jacobs Group, Heileman, and Pabst clearly indicates that it was in payment of expenses incurred by the Jacobs Group in settlement of all litigation pending among those parties and expenses incurred in the Jacobs Group's two-year fight to gain control of Pabst. (PX 6, pp. 13 & 14.) The only creditable evidence before the Court is defendant Mathisen's testimony that the Jacobs Group expenses were "somewhere between seven and eight million dollars" as of November 24, 1982. (Tr. 123.) He also testified that a list of all expenses incurred by the Jacobs Group was subsequently prepared at the request of the Securities and Exchange Commission ("SEC") and submitted to the SEC. (Tr. 135–36.) The SEC conducted a formal investigation into the $7,500,000 paid to the Jacobs Group by Heileman and Pabst under the November 26 Settlement Agreement and took no action. (Tr. 134–35.) The list of expenses for law firms, investment backers, proxy solicitors, printing costs, public relations firms, etc., amounted to more than $7,000,000, excluding carrying costs of the stock. (PX 22; Tr. 136–37, 145.) The Court then concludes based on the undisputed evidence that the payment of $7,500,000 to the Jacobs Group was to reimburse it for expenses and was not a "bonus" payment for the Pabst shares. The Court therefore concludes that Kalmanovitz is not entitled under the November 18 supplemental agreement to 50% of the $7,500,000 expenses paid to the Jacobs Group by Heileman and Pabst.

■ Therefore, the Court will enter final judgment in accordance with this opinion in favor of the plaintiff and against the defendants in the amount of $4,001,937 together with interest[4] thereon from December 23, 1982.

---

4. This action was originally brought in the Marin County Superior Court of California, C83 0704; it was removed as a diversity action to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. §§ 1332(a) and 1441(a); thereafter the case was transferred to this Court pursuant to 28 U.S.C. § 1404(a) and consolidated with other litigation between some of the same parties. Since this

part of the case for disposition here is a diversity action, California State law governs the award of prejudgment and postjudgment interest. *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1522 (9th Cir.1985). The prejudgment interest rate for detention of money in California is limited to the legal rate of 7% per annum. Cal.Const. Art. 15 S 1. Postjudgment interest is limited to 10% per annum. Cal.Code Civ.Proc.,

§ 685.010. Those rates will be included in the final judgment.