Paul KALMANOVITZ, individually and as a shareholder of Pabst Brewing Company, and S & P, Inc., a California corporation, Plaintiffs,

v.

G. HEILEMAN BREWING COMPANY, a Wisconsin corporation; Russell G. Cleary; HBC Acquisition, Inc., a Delaware corporation; and William F. Smith, Jr., Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay, Defendants.

Civ. A. No. 82–797–JLL.

United States District Court, D. Delaware.

Dec. 8, 1986.

Peter M. Sieglaff of Potter, Anderson & Corroon, Wilmington, Del., for Paul Kalmanovitz.

William J. Wier of Herlihy & Wier, Wilmington, Del., Theodore F. Schwartz and Barry Ginsburg, Clayton, Mo., for Alioto & Alioto.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

The dispute which necessitates this opinion arose at the end of four years of litigation surrounding the battle for control of Pabst Brewing Company.[1] In its most recent opinion,[2] this Court awarded judgment in favor of Paul Kalmanovitz ("Kalmanovitz") against Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach, and Daniel T. Lindsay (collectively the "Jacobs Group"), for breach of contract in an amount of $4,006,937. The Jacobs Group appealed the Court's decision, but the Third Circuit recently affirmed the judgment in favor of Kalmanovitz. *Kalmanovitz v. G. Heileman Brewing Co.*, 804 F.2d 1248 (3d Cir.1986). While the case was being appealed, the law firm of Alioto & Alioto

---

1. The Court has nine prior published opinions concerning or relating to the battle for control of Pabst: *Kalmanovitz v. G. Heileman Brewing Co.*, 632 F.Supp. 1259 (D.Del.1986); *Kalmanovitz v. G. Heileman Brewing Co.*, 610 F.Supp. 1319 (D.Del.1985); *Kalmanovitz v. G. Heileman Brewing Co.*, 595 F.Supp. 1385 (D.Del.1984); *Kalmanovitz v. G. Heileman Brewing Co.*, 576 F.Supp. 922 (D.Del.1983); *United States v. G. Heileman Brewing Co.*, 563 F.Supp. 642 (D.Del. 1983); *Pabst Brewing Co. v. Kalmanovitz*, 551

F.Supp. 882 (D.Del.1982); *Jacobs v. G. Heileman Brewing Co.*, 551 F.Supp. 639 (D.Del.1982); *Pabst Brewing Co. v. Jacobs*, 549 F.Supp. 1068 (D.Del.), *aff'd*, 707 F.2d 1392 (3d Cir.1982); *Jacobs v. Pabst Brewing Co.*, 549 F.Supp. 1050 (D.Del.1982).

2. *Kalmanovitz v. G. Heileman Brewing Co.*, 632 F.Supp. 1259 (D.Del.1986).

("Alioto"),[3] some of the attorneys for Kalmanovitz, filed a motion for attorneys fees. (Docket Item ["D.I."] 223.) Alioto claims it is entitled to 50% of the judgment in favor of Kalmanovitz under the terms of an oral contingent fee agreement between Kalmanovitz and Alioto. (*Id.* at ¶¶ 6–7.)

Alioto requested that this Court exercise ancillary jurisdiction to resolve this dispute and, pursuant to Rule 67 of the Federal Rules of Civil Procedure, order the Jacobs Group to pay the judgment into the registry of the Court pending resolution of the dispute. Oral argument was held on November 25, 1986. Given the return of a mandate by the Third Circuit on November 24, 1986, to pay the judgment, the Court announced from the bench its decision to deny both parts of Alioto's motion and reserved the right to file this opinion explaining the decision.

## I. FACTS

Given this Court's extensive discussion in prior opinions of the facts relating to various stages of the battle for control of Pabst,[4] only the facts pertinent to Alioto's motion shall be set forth.

Between November 1980 and October 1982, the Jacobs Group made substantial purchases of Pabst stock. (PX 1, ¶¶ 4, 5.)[5] After several unsuccessful attempts by the Jacobs Group to take control of Pabst, Kalmanovitz, who has been in the brewing business for many years, was sought as a partner in the attempt to take over Pabst. (PX 1, ¶ 6.) The Jacobs Group, Kalmanovitz, and each party's attorneys met on several occasions before signing a contract (the "Contract") on October 26, 1982. The Contract recites that members of the Jacobs Group collectively owned 1,140,305 shares of Pabst and also owned all the shares of PST Acquiring Corp. ("PST"), which owned all the stock of JMSL Acquiring Corp. ("JMSL"). (PX 2, pp. 1, 2.) The Contract states that the Jacobs Group would sell 50% of the PST stock to Kalmanovitz. (PX 2, p. 2.) Additionally, the Contract required Kalmanovitz and the Jacobs Group to make a tender offer through JMSL for 3,000,000 shares of Pabst stock at $24 per share. (*Id.*)

JMSL commenced a tender offer for Pabst stock at $24 per share on October 27, 1982, pursuant to the terms of the Contract. (PX 1, ¶ 15.) This offer was followed by a competing tender offer for Pabst at $27.50 per share from HBC Acquisition, Inc. ("HBC"), a wholly owned subsidiary of G. Heileman Brewing Company ("Heileman"). (PX 1, ¶ 17.) The Jacobs Group did not have additional money to finance an increase in the JMSL offer. After a series of meetings between Irwin Jacobs ("Jacobs") and Kalmanovitz, Kalmanovitz agreed on November 18, 1982, to provide an additional $18,000,000 so the JMSL offer could be raised from $24 to $30 per share. (PX 1, ¶ 30.) In consideration for this additional financing, the Jacobs Group agreed that if the Group decided it was better to sell its Pabst shares, rather than bidding higher, then Kalmanovitz would receive fifty percent of all amounts in excess of $24 per share. (PX 1, ¶¶ 28, 29; PX 4.)

After a volley of offering price increases and tactical maneuvers between JMSL and HBC, Jacobs concluded on November 24, 1982, that the most advantageous act would be to reach an agreement with HBC. Without consulting Kalmanovitz, Jacobs called Russell Cleary, the Chairman of Heileman, to propose a "resolution" of the competing tender offers. (Tr. 58.) The discussions following this initial contact led to a settlement agreement between the Jacobs Group, Heileman, and Pabst on No-

---

**3.** Throughout this opinion "Alioto" will be used to refer to the law firm, whereas "Mr. Alioto" will be used to refer specifically to Joseph Alioto.

**4.** *See* footnote 1.

**5.** "PX" refers to plaintiff's exhibits at the trial resolving Kalmanovitz's breach of contract action against the Jacobs Group. *See Kalmanovitz v. G. Heileman Brewing Co.,* 632 F.Supp. 1259 (D.Del.1986). "DX" refers to defendants' trial exhibits and "Tr." refers to the transcript of that trial. (D.I. 205.)

vember 26, 1982. (PX 6.) The settlement provided that HBC would make a new tender offer on December 2, 1982, for 5.6 million shares of Pabst stock at $29 per share. (PX 1, ¶ 43.)

Kalmanovitz opposed the settlement and viewed it as a breach of the Contract with the Jacobs Group. (PX 1, ¶ 45; DX 10.) Kalmanovitz and his wife, through a company known as 21–115 Inc., on December 6, 1982, commenced a tender offer to compete with the HBC offer. (PX 1, ¶ 47.) Additionally, Kalmanovitz filed an action in this Court against Heileman and Pabst seeking, *inter alia,* to enjoin them from purchasing Pabst stock from the Jacobs Group. (*Id.,* ¶ 49.) This Court denied the application for injunctive relief on December 20, 1982. (*Id.,* ¶ 51.)

Kalmanovitz continued his effort to take control of Pabst until December 23, 1982, when Heileman accepted 5.6 million shares of Pabst stock tendered to the HBC offer of $32 per share. This purchase included 946,453 of the 1,140,305 shares of Pabst stock owned by the Jacobs Group. (PX 1, ¶ 54.) Therefore, the amount received by the Jacobs Group in excess of $24 per share was $8 times 946,453 shares or $7,571,624. Additionally, Heileman and Pabst paid $7,500,000 to the Jacobs Group for expenses pursuant to paragraph 8 of the November 16, 1982 settlement agreement. (Tr. 22.)

Once the battle for control of Pabst was over, the Jacobs Group did not pay to Kalmanovitz any of the amount received in excess of $24 per share for the Group's Pabst stock. Kalmanovitz brought an action in California state court to recover fifty percent of this excess amount.[6] This action was transferred to the Northern California Federal District Court. Judge Patel consolidated this pendant state law claim with a federal antitrust action brought by Kalmanovitz and transferred the matter to this Court. At trial, Jacobs testified that Kalmanovitz was not paid because Kalmanovitz interfered with the Jacobs Group's right to sell its Pabst stock. (Tr. 84.) The Court decided this case in favor of Kalmanovitz and entered judgment in the amount of $4,001,937 plus interest thereon from December 23, 1982.[7]

When Kalmanovitz's suit against the Jacobs Group began, Kalmanovitz was represented by Alioto & Alioto. At the final pretrial conference held on March 22, 1985, the Court raised, *sua sponte,* the issue of whether Joseph Alioto and the Alioto law firm had to be disqualified from representing Kalmanovitz, because Mr. Alioto was to be called as a witness at trial. (D.I. 184.) The Jacobs Group moved for an order disqualifying Joseph Alioto and his law firm, pursuant to Disciplinary Rules 5–102(A), 5–102(B), and 5–105(D) of the American Bar Association Code of Professional Responsibility ("DR").[8] After considering Mr. Alio-

---

6. Kalmanovitz also claimed he was entitled to half of the $7,500,000 paid to the Jacobs Group for expenses. He characterized this payment as a bonus. The Court rejected this claim after being presented with evidence that the Jacobs Group had valid expenses in excess of $7,500,000.

7. *Kalmanovitz,* 632 F.Supp. at 1267.

8. The Code of Professional Responsibility (revised 1985) adopted by this Court is the American Bar Association's Code of Professional Responsibility which was adopted, with certain modifications not applicable to the issues at bar, by the Supreme Court of the State of Delaware on March 22, 1971. That Code governs the conduct of attorneys appearing before this Court. Local Rule 8(D)(2) (1985).

The Disciplinary Rules set forth the circumstances under which an attorney and his firm must withdraw from representation of a client. DR5–102(A) provides:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm *ought to be called as a witness on behalf of his client,* he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR5–101(B)(1) through (4) [which state that a lawyer or his firm may testify:]

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

to's involvement in critical events surrounding the agreements between Kalmanovitz and the Jacobs Group,[9] this Court found that Mr. Alioto possessed crucial information which should be divulged at trial. Therefore the Court held that Mr. Alioto had to withdraw from his representation of Kalmanovitz. *Kalmanovitz*, 610 F.Supp. at 1325. Due to Mr. Alioto's disqualification, local Delaware counsel for Mr. Kalmanovitz represented him at the trial on August 12, 1985, which resulted in the judgment in favor of Kalmanovitz.

After a series of post-trial briefs were submitted by the parties, a final judgment and order was entered by this Court in the Kalmanovitz contract action against the Jacobs Group on April 8, 1985. (D.I. 216.) On April 18, 1985, the Jacobs Group filed a notice of appeal, made a motion for a stay of execution of the judgment pending the appeal, and posted a supersedeas bond as security for the judgment pending the appeal. (D.I. 217–19.) The Court granted this motion. (D.I. 220.) On November 19, 1986, six days prior to the return by the Third Circuit of a certified copy of judgment and order in lieu of mandate affirming this Court, counsel for Alioto filed the present motion to recover attorney fees and to have the Jacobs Group pay the judgment owed to Kalmanovitz into the registry of the Court pending the resolution of the fee dispute. (D.I. 223.)

Kalmanovitz and Alioto have had a lawyer-client relationship for over thirty years during which time fee arrangements were negotiated and orally agreed to by Joseph Alioto and Kalmanovitz. (*Id.* at. ¶¶ 4, 5.) Alioto was retained by Kalmanovitz to represent him in the contract action against the Jacobs Group. Alioto claims in its mo-

tion that Kalmanovitz orally agreed to grant Alioto a 50% contingent fee in lieu of the customary retainer. (*Id.* at ¶ 7.) The motion also states that in December 1985, after the contract action had been tried by this Court, Kalmanovitz became angry with Mr. Alioto over "social matters" unrelated to the Jacobs case and therefore, terminated the lawyer-client relationship. (*Id.* at ¶ 14.) Also, according to the motion, after this Court rendered judgment against the Jacobs Group, Kalmanovitz informed Alioto that it did not have an interest in the favorable judgment, that he was not going to pay any fees or costs, and that he refused to recognize the existence of the oral fee agreement. (*Id.* at ¶ 15.)

At the time Alioto's motion was filed, the Jacobs Group was preparing to satisfy the judgment, which would stop the running of post-judgment interest, as soon as the Third Circuit returned its judgment and order affirming this Court's decision. the Jacobs Group did not know where or to whom to pay the judgment until this motion was resolved. Therefore, oral argument was held on November 25, 1986, after counsel for Alioto and Kalmanovitz had submitted memorandums in support or opposition to the motion. The Court announced its decision to deny Alioto's motion from the bench and reserved the right to file this opinion which explains the Court's decision.

## A. Request For Order Compelling Jacobs Group To Pay Judgment Into The Registry Of The Court.

Rule 67 of the Federal Rules of Civil Procedure allows a party "by leave of court" to deposit a monetary judgment into the registry of the court.[10] Alioto's memo-

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case. (Emphasis added.)

Finally, DR5–105(D) states that if a lawyer is required to withdraw from representation of a

client in a particular matter, no partner, associate, or other lawyer associated with him or his firm may continue to represent the client in that matter.

9. *See Kalmanovitz*, 610 F.Supp. at 1323–25, for a detailed explanation of Mr. Alioto's involvement.

10. The full text of Rule 67 states:

randum in support of its motion correctly states that Rule 67 has been used to give a judgment debtor the opportunity to deposit a judgment over which others had conflicting claims into the registry of the court to obtain a satisfaction of that judgment. *See United States Overseas Air v. Compania Aerea Viajes,* 161 F.Supp. 513, 515 (S.D.N.Y.1958).

Despite the fact that Kalmanovitz and Alioto have conflicting claims to the same fund, this Court did not order the payment of the judgment into the registry of the Court for two reasons. First, the Court is confident of Kalmanovitz's ability to pay any judgment obtained by Alioto for attorneys fees. Evidence presented to the Court during the past four years of litigation indicates that Kalmanovitz has a net worth in the tens, if not hundreds, of millions of dollars. The judgment from the Jacobs Group does not need to be paid into the registry of the Court to ensure that Kalmanovitz can satisfy a successful claim by Alioto. In addition to its first reason, this Court did not order the funds to be paid into the registry, because of its decision to deny the portion of Alioto's motion requesting the Court to adjudicate the fee dispute.

## B. Request For Exercise Of Ancillary Jurisdiction Over The Fee Dispute.

If the motion for attorneys' fees was not related to the preceding litigation, this Court would clearly not have jurisdiction over the dispute. The attorney fee dispute does not present a federal question and complete diversity among the parties does not exist, because both Kalmanovitz and Alioto are California citizens. Despite the lack of a federal question or diversity, Alioto contended that the Court has ancillary

jurisdiction to resolve the attorney fee dispute, because the dispute is directly related to prior litigation before this Court.

Courts disagree on whether an attorney fee dispute arising out of litigation properly before the court can be resolved by exercise of a court's ancillary jurisdiction. *See Jenkins v. Weinshienk,* 670 F.2d 915 (10th Cir.1982); *United States v. Ford,* 650 F.2d 1141 (9th Cir.1981); *Iowa v. Union Asphalt & Roadoils, Inc.,* 409 F.2d 1239 (1969). *But see Taylor v. Kelsey,* 666 F.2d 53 (4th Cir.1981). The Third Circuit has not yet confronted the attorney's fee issue, but did set forth in a recent case a three-tiered method to determine whether a court can or should exercise its ancillary jurisdiction. *Ambromovage v. United Mine Workers of America,* 726 F.2d 972 (3d Cir.1984). Briefly stated, the three tiers are (1) does the court have the constitutional power to determine a state law claim, (2) would the exercise of jurisdiction violate a particular federal policy decision, and (3) does the court determine, after weighing various factors, that hearing the state law claim is appropriate. The Court will discuss in order how each tier relates to Alioto's motion for attorney fees.

The first *Ambromovage* tier hinges on the question of whether a "common nucleus of operative fact" exists between the pendent state law claim and the related federal claims. *Id.* at 989, *citing United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The *Ambromovage* court described a continuum of related state law claims. On one end of the continuum are compulsory counterclaims. The *Ambromovage* court noted that the Supreme Court has held that compulsory counterclaims fall within the scope

In an action in which any part of the relief sought is a judgment for a sum of money or the disposition of a sum of money or the disposition of any other thing capable of delivery, a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing, whether or not that party claims all or any part of the sum or thing. The party making the deposit shall serve the order permitting

deposit on the clerk of the court. Money paid into court under this rule shall be deposited and withdrawn in accordance with the provisions of Title 28, U.S.C., §§ 2041, and 2042; the Act of June 26, 1934, c. 756, § 23, as amended (48 Stat. 1236, 58 Stat. 845), U.S.C., Title 31, § 725v; or any like statute. The funds shall be deposited in an interest-bearing instrument approved by the court.

of a federal court's ancillary jurisdiction. 726 F.2d at 990, *citing Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). Farther along the continuum are permissive counterclaims which are not necessarily within the scope of federal ancillary jurisdiction. *Id.* For these claims, a court must apply the "common nucleus of operative fact" test.

This Court finds that Alioto's claim for attorney fees is much more analogous to a permissive counterclaim than to a compulsory counterclaim. The claim for attorney fees is not mandatorily tied to the federal questions that initially brought the litigation into this Court. Therefore, the Court must determine whether there is a "common nucleus of operative fact" between the preceding litigation and the claim for attorney fees.

■ A common nucleus of operative fact does not exist between the claim for attorney fees and the prior litigation. The alleged contract between Alioto and Kalmanovitz did not arise out of the facts surrounding the battle for control of Pabst or the contract between Kalmanovitz and the Jacobs Group. The same is true for the facts causing the alleged breach of contract. To adjudicate the dispute between Alioto and Kalmanovitz, this Court would have to be presented with new facts unrelated to the operative facts in the past nine decisions on the various issues arising in this ongoing litigation. The lack of a common nucleus of facts compelled this Court to reject Alioto's argument that this Court has ancillary jurisdiction over the attorney fees dispute.

The second *Ambromovage* tier requires a court to ask whether the exercise of jurisdiction will violate a federal policy decision limiting federal jurisdiction. The *Ambromovage* court refers to *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), and *Owen Equipment and Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), as examples of the Supreme Court's concern about how ancillary or pendent jurisdiction is used. *Ambromovage*, 726 F.2d at 991.

*Aldinger* involved a plaintiff who brought a pendent claim against a county government in a civil rights suit. The county was excluded from liability under 42 U.S.C. § 1983. The Court held that the section 1983 exclusion could not be circumvented by allowing a district court to exercise pendant jurisdiction over an otherwise excluded defendant. In *Owen* a plaintiff sued a diverse defendant, who in turn impleaded a third-party defendant which was not diverse to the plaintiff. The plaintiff amended the complaint to state a claim against the third-party defendant, and dismissed the suit against the original defendant. The Court held that ancillary jurisdiction could not be used to adjudicate the claim between the plaintiff and third-party defendant, because this would undermine the complete diversity requirement of 28 U.S.C. § 1332.

The concerns expressed in the second *Ambromovage* tier do not apply to Alioto's motion. Although Kalmanovitz and Alioto are non-diverse parties, Alioto did not attempt to manufacture jurisdiction in a federal court or circumvent a federal statute. Therefore, the second tier by itself does not bar the exercise of ancillary jurisdiction over the present dispute.

The third *Ambromovage* tier was set forth by the Third Circuit as follows: "The final level—prudential in character—is for the district court, *in its discretion*, to weigh various factors bearing on the appropriateness of hearing a pendent claim." 726 F.2d at 990 (emphasis added). Given this statement of the third level, a district court may decide not to hear an ancillary claim even though the requirements of the first two tiers have been satisfied.

When making a discretionary determination under the third tier, a court must consider factors such as fairness to the litigants, judicial economy, and the interests of federalism. *Id.* at 991. The Court examined and weighed these factors prior to making its ruling on Alioto's motion. Even if the Court had found a common nexus of operative fact as required by the first tier, the Court still would have denied

the motion, due to its assessment of the relevant factors.

■ To be fair to the litigants in this dispute, the claim should be litigated in California. The dispute revolves around an alleged oral contract which was made in California. The testimony of the parties to the alleged contract probably will be very important. Due to medical conditions which restrict his ability to travel, Kalmanovitz will not be able to present live testimony to this Court. This fact weighs heavily in favor of having the dispute resolved in California. The present situation is unlike cases where a defendant attempts to transfer an action to a location more convenient for himself, yet less convenient for the plaintiff. Logistically, California is a more convenient location for the resolution of this dispute for both Kalmanovitz and Alioto. Additionally, other potential witnesses are more likely to be found in California than Delaware.

Alioto strenuously contended that judicial economy would be served if this Court resolves the dispute. For reasons closely related to part of the discussion about the lack of a nexus of closely related operative fact, the Court disagrees with Alioto's contention. To adjudicate this dispute, the Court will have to hear evidence on the circumstance surrounding the alleged establishment and breach of the oral contingent fee contract. This evidence has very little in common with the evidence the Court has heard over the past four years. A California court should be able to hear this evidence and evaluate it in light of California law just as efficiently as this Court.

Finally, the Court notes that federalism concerns weigh against exercising ancillary jurisdiction. The *Ambromovage* court expressed concern with the extent to which a federal court becomes involved in state law. 726 F.2d at 992. ("Because the claims must be liquidated in order for the exception to apply, the federal court is not required to apply state law in assessing damages except in the most mechanical factor. In addition, since there is no affirmative recovery, the federal court does not get involved in state debt collection. Federalism concerns, therefore, are not strongly implicated.") This Court concluded, prior to denying Alioto's motion, that to adjudicate this dispute it would have to become deeply involved in important questions of California law.

California, like every other state, "has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses." *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 434, 102 S.Ct. 2515, 2522, 73 L.Ed.2d 116 (1982). The present dispute over attorney fees touches on that interest, because in July 1982, California enacted a statute requiring all contingent fee arrangements to be in writing. Cal. Bus. and Prof. Code § 6147. The statute became effective on January 1, 1983. The statute may or may not apply to the alleged oral contract between Kalmanovitz and Alioto. The original action brought against the Jacobs Group was filed January 17, 1983, but this does not resolve whether a contract was made prior to January 1, 1983. Given California's interest in regulating its attorneys, the determination of if and how the statute applies to the present dispute should be made by a California court.[11]

---

11. The Court notes that it has been stated that "[t]he determination of relations between a party in litigation in a federal court and his attorneys is a matter relating to the protection of the court's own officers and is not subject to the doctrine of *Erie Railroad Co. v. Tompkins....*" *National Equipment Rental, Ltd. v. Mercury Typesetting Co.,* 323 F.2d 784, 786, n. 1 (2d Cir. 1963). While the Court is concerned with the protection of its own officers, the Court interprets the three-tiered *Ambromovage* test as a guideline of how far federal ancillary jurisdic-

tion can extend. Additionally, *Mercury Typesetting* has not been interpreted to mean that jurisdiction should be exercised over every type of attorney fees dispute. *See Boughten v. Voss,* 634 F.2d 880, 882 (5th Cir.1981).

The Court also notes that the present case is unlike cases where an attorney fees dispute had to be resolved before litigation on a matter properly before a federal court could proceed. *See, e.g., Jenkins v. Weinshienk,* 670 F.2d 915 (10th Cir.1982) (dismissed attorney can retain

## II. CONCLUSIONS

For the reasons discussed in this opinion, the Court denied Alioto's motion and entered an appropriate order to that effect.

all papers relevant to pending litigation until fees have been paid or bond has been posted). In a situation such as *Jenkins,* the need to pro-

ceed with the federal court litigation justifies having the dispute resolved by a federal court, instead of a state court.